In re The BAAN COMPANY
SECURITIES LITIGATION.

This Order Relates to All Actions.

Civil Action No. 98–2465 (JHG)(JMF).

United States District Court,
District of Columbia.

June 21, 2000.

# 4

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Leslie Gordon Fagen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Joshua H. Vinik, Lee S. Shalov, Cary L. Talbot, Milberg, Weiss, Bershard, Hynes & Lerach, LLP, New York City, Ralph M. Stone, Shalov, Stone & Bonner, New York City, for Plaintiffs.

Leslie Gordon Fagen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Andrew L. Sandler, Colleen Patricia Mahoney, Joan Margaret Macaulay, Stephen Paul Vaughn, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, Robert James Symon, Spriggs & Hollingsworth, Luis De La Torre, S.E.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs' amended consolidated complaint, filed April 22, 1999, alleges securities fraud against Baan Company, N.V. (Baan) and several of its officers and directors. Baan is a Netherlands corporation with offices in the Netherlands and Reston, Virginia. The uncertified class consists of individuals who bought Baan securities (including common stock, ADRs, warrants, and options) between January 28, 1997, and October 12, 1998. These purchases were made on the NASDAQ National Market, the Amsterdam stock exchange, and the Frankfurt stock exchange, as well as other stock exchanges in Germany.

Plaintiffs bring allegations against Baan, Jan Baan, J.G. Paul Baan, Tom C, Tinsley, N.M. Wagenaar, William O. Grabe, David C. Hodgson, Amal M. Johnson, and Vanenburg Ventures, B.V.,[1] under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Plaintiffs also bring claims against all of the defendants, with the exception of Amal M. Johnson, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[2]

Defendants Paul Baan and Vanenburg brought motions to dismiss under Fed. R.Civ.P. 12(b)(2) for lack of personal jurisdiction, and under Magistrate Judge Facciola's January 14 and May 17, 2000, Orders and this Court's March 29, 2000, Order, the parties are presently undertaking discovery on the issue of personal jurisdiction. This Opinion addresses a separate motion to dismiss brought by defendant Vanenburg under Fed.R.Civ.P. 12(b)(6) and 9(b), as well as a motion to dismiss by Jan Baan, and a motion to dismiss brought by Baan, Grabe, Hodgson, Johnson, Tinsley and Wagenaar together. In these motions the defendants challenge subject matter jurisdiction, and argue that plaintiffs have failed to state a claim because they have not adequately alleged a material misstatement or omission, scienter, or control person status. Defendants' motions to dismiss for lack of subject matter jurisdiction are granted as to those plaintiffs who neither reside in the United States nor purchased their stock in the United States. Defendants' motions to

---

1. Vanenburg Ventures, B.V. was formerly called Baan Investment B.V. For simplicity, the Court will use the term "Vanenburg" to describe the company, regardless of the date of the events being discussed.

2. Paragraph 2 of the complaint generally alleges that each individual defendant was a control person, without exempting Johnson, but in the claim for relief where plaintiffs name the defendants alleged to be liable as control persons, they do not name Johnson.

dismiss the claims brought under Section 10(b) are granted as to Paul Baan, Vanenburg, Grabe, and Hodgson, and denied as to Baan, Wagenaar, Tinsley, Johnson, and Jan Baan. Jan Baan, Paul Baan, and Vanenburg's motions to dismiss the Section 20(a) control person claims are denied.[3]

## I. FACTUAL BACKGROUND

In considering a motion to dismiss, the Court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the plaintiffs. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Accordingly, the facts in this section are drawn from the complaint, and from the documents plaintiffs reference in their complaint and which are included as exhibits in defendants' motion to dismiss.

Plaintiffs allege that Baan's reported revenue and earnings were fraudulently inflated, that the defendants made statements that were materially misleading and omitted material facts, and that some of the defendants took advantage of the inflated stock price by selling some of their own stock. The improper inflation of reported revenue and earnings was achieved through the cooperative efforts of Baan, Vanenburg, and their affiliates and subsidiaries.

Vanenburg is a privately held Dutch company controlled by two brothers, Jan and Paul Baan. *See* Baan's Annual Report to the Securities and Exchange Commission (SEC) for the fiscal year ending December 31, 1997 ("1997 Form 20–F") at p.53, and Baan's May 7, 1998, press release. Through Vanenburg, Paul and Jan Baan have voting control over a large block of Baan's stock. In 1996, that block constituted approximately 43% of Baan's outstanding common shares, *see* Baan's Annual Report to the SEC for the fiscal year ending December 31, 1996 ("1996 Form 20–F") at p.45, and in 1997 it was approximately 39%, *see* 1997 Form 20–F at p.52. In approximately November 1998, Vanenburg's share was reduced to 30%. BBS Holding B.V. (BBS) is a majority-owned subsidiary of Vanenburg which owns approximately 15 of Baan's "channel partners."[4] During 1997 Baan and Vanenburg formed Baan Midmarket Solutions (BMS), with an 85% ownership by Vanenburg and 15% ownership by Baan. *See* 1997 Form 20–F at p.54.

In addition to his interest in Vanenburg, Jan Baan founded Baan in 1978, served as Baan's Chief Executive Officer (CEO) until July 1998, was a managing director of Baan throughout the class period, and was a managing director of Vanenburg until January 1998. Paul Baan served as chairman of Baan's board of supervisory directors from April 1996 to December 1997, and has been president and managing director of Vanenburg since 1994. Wagenaar was the Chief Financial Officer (CFO) and Senior Vice President of Administration for Baan beginning in August 1997, became Baan's Chief Operating Officer (COO) in April 1998, and had previously served as Vanenburg's COO. Tinsley was President and COO of Baan beginning in November 1995, and has been chairman of the board of directors since April 1998 and CEO since July 1998, as well as a member of the audit committee throughout the class period. Grabe and Hodgson have been supervisory directors and members of Baan's audit committee throughout the class period. Johnson was Executive Vice President of Americas Operations for Baan

---

**3.** The Court has considered all other arguments raised with these motions and deems it unnecessary to address them specifically, in light of the decision here.

**4.** There are frequent references to Baan's "channel partners" in the papers, which are companies that purchase and resell Baan's products. In other words, sales to "channel partners" are not sales to end users of Baan's products. Many, but not all, of these channel partners are affiliates of Vanenburg and Baan.

beginning in January 1996, acting managing director and Executive Vice President of Affiliates and Marketing since January 1997, and has had responsibility for Baan's Supply Chain Division since January 1998.

The primary activity which enabled defendants to allegedly inflate Baan's reported revenue and earnings was the shipment of merchandise to Baan's affiliates on what the plaintiffs call a "consignment" basis. In essence, plaintiffs allege that Baan made these shipments with the knowledge that the sales to the affiliates were not final, and that if the affiliates were unable to re-sell Baan's products, Baan would have to buy the products back. Plaintiffs allege that in violation of Generally Accepted Accounting Procedures (GAAP) and SEC regulations, Baan recognized these consignment sales as revenue. The bulk of the statements and omissions plaintiffs allege to be materially misleading are misleading because they incorporate or rely on the inflated revenue figures, and fail to disclose that consignment sales to related parties were being counted as revenue.

The misleading statements upon which plaintiffs rely were communicated to the public through three basic formats. First, through Baan's filings with the SEC, including its annual 20–F and quarterly 6–K forms; second, press releases and statements on Baan's website; and, finally, news articles, some of which include quotes from Baan's officers. Only some of these were published in the United States, and many of them included warnings and disclosures. A chronological overview of these statements, as described in the complaint, will provide a framework in which the plaintiffs' allegations may be best understood.[5]

### 1996 Year End Figures

As noted earlier, the class period begins on January 28, 1997. On that date, Baan issued a press release reporting "record net revenues" for 1996, and on the following day Baan's website reported "dramatic growth" while noting that 30% of the revenue for the year was derived from "indirect channel sales". In April 1997 Baan filed its 1996 20–F, reporting net revenue from licenses of $224.24 million[6], total net revenue of $387.96 million, and disclosing that $14.5 million in revenue was from channel sales to its affiliate BBS. Like all of Baan's subsequent filings with the SEC, the 20–F indicated that Baan's accounting practices were in accordance with GAAP. *See* 1996 20–F at p.53.

### First Quarter 1997

In April 1997 Baan issued a press release celebrating its continued dramatic growth and anticipating the earnings for the quarter, with a quote from Tinsley regarding matters such as the high demand for Baan products. In May, Baan filed its 6–K for the first quarter of 1997. The document revealed that Baan had total revenues of $123.87 million and license revenues of $77.37 million, a substantial increase over the 1996 first quarter revenues of $77.93 and $40.07 million, respectively.

### Second Quarter 1997

In July 1997 Baan issued a press release regarding the second quarter, again including quotations from Tinsley, and again followed the next month by Baan's 6–K. The 6–K revealed Baan's continuing increasing license revenue of $92.3 million for the quarter.

### Third Quarter 1997

On January 21, 1998, Baan filed a 6–K for the third quarter, reporting license revenue of $108.7 million. The previous fall the company had issued a press release and an interview with Jan Baan announcing "record revenue and earnings" for that quarter and "a fast growth track for the foreseeable future."

---

**5.** This listing does not encompass all of the statements referenced in plaintiffs' complaint, but does include the more significant and representative examples.

**6.** When possible, the figures are rounded to the nearest $10,000.

*Fourth Quarter 1997*

Although Baan issued a press release regarding the fourth quarter, and news reports remarked on Baan's continuing growth, plaintiffs indicate that Baan neither filed a 6–K for the fourth quarter nor included separate numbers for fourth quarter revenue in its annual 20–F. In its January 29, 1998 press release, Baan announced "record revenues" for the fourth quarter, including license revenue growth of 72% over the previous year. Several news reports around that time contained Jan Baan's positive projections about the company, including expectations that Baan would "continue to outpace the growth of the market."

Plaintiffs allege facts which suggest that by this point in time, at least some of the defendants may have been aware of signs of trouble. Plaintiffs claim that Baan's channel partners informed Baan they were having difficulty selling Baan's software to end-users, resulting in a backlog of unsold goods and their inability to accept more Baan products for resale.[7] In February 1998, Grabe and Hodgson each sold 40,000 shares of Baan stock, General Atlantic Partners, of which Grabe and Hodgson were managing partners, sold 491,427 shares, and GAP Coinvestment Partners, of which Grabe and Hodgson are general partners, sold 68,532 shares. At that point in time, Baan stock was worth roughly $45 per share.

*1997 Year End Figures*

In May 1998 Baan filed its 1997 20–F with the SEC, showing a net revenue of $679.6 million, and license revenue of $433.43 million. Baan disclosed that $66.33 million of that license revenue was from related parties.[8] Baan further disclosed that approximately $11.6 million of the license revenue had been recognized, despite the fact that the inventory it represented remained unsold at the end of 1997. However, Baan indicated that all such remaining inventory had been sold during the first quarter of 1998. In May 1998, AFX News interpreted Baan's 20–F to show that receivables sold to BBS accounted for $50 million, of which $18 million was for potential future license income, and some of which was based on unsold BBS inventories. Another news report interpreted the 20–F to suggest that Baan had recognized $13 million in revenue from BMS. Baan explained the large fourth quarter revenues by its belief that Baan had "been positively impacted by year-end capital purchases by larger corporate customers." Baan's 20–F also reported that Baan had charged Vanenburg $8.6 million for management information systems and marketing costs and services.

*First Quarter 1998*

On April 20, 1998, analysts predicted that Baan's first quarter for 1998 would show revenues of $209 million, and a net income of about $24 or $25 million. On April 21, 1998, Baan announced its first quarter results in a press release, indicating that net revenue was $176 million, license revenue was $90 million, and net income was $2.4 million.[9] The press release explained the lower than expected results as a reflection of a $71 million increase in deferred revenues for the quarter, approximately $43 million of which was due to the implementation of a new SEC accounting pronouncement. State-

---

**7.** Plaintiffs do not provide any specific facts or information to serve as a basis for this claim, however, nor do they specify when the communications were made.

**8.** In a press release later that month, Baan elaborated on the nature of its relationship with Vanenburg, BBS, and BMS. Baan explained that its sales strategy was to boost sales by using indirect channels, i.e. selling to "mid-market" resellers. Baan stated that

"henceforth most revenues from the indirect channel to Baan Company will flow through BMS," but also indicated that revenue and cost was recognized no differently for transactions with related parties (such as BMS) than for transactions with other third parties.

**9.** Baan's 6–K, filed in July, reflected only slightly different figures: $179.48 million total revenue, and $92.9 million license revenue.

ment of Position (SOP) 97–2 had replaced SOP 91–1, and Baan indicated that uncertainty about the new SOP caused it to defer revenue from software which had been delivered under certain signed contracts, and which Baan would have recognized as revenue under the old SOP. Tinsley issued a written statement reflecting Baan's decision to defer revenue from those certain contracts. In May, Baan's auditors were replaced with a new company. The press reported that Baan would no longer be a party to financing agreements with its customers, and that Baan's "established practice of submitting all transactions with affiliates to its outside auditors" would continue, and quoted Wagenaar as saying that "these clarifications address the uncertainties surrounding the implementation" of SOP 97–2. *See* Complaint at ¶ 82.

In July 1998 Baan filed its 6–K for the first quarter, which specified that of its $92.9 million in license revenue, $18.18 million had been from sales to related parties. Baan also revised its net profit down from the $2.4 million it had announced in April, to a net profit of $2.14 million. Baan's 6–K disclosed that through 1997, Baan had recognized indirect channel sales at the time of shipment, "subject to certain conditions including an evaluation of the amount of inventory carried by the reseller channel." Third Quarter 6–K at pp.11–12. The 6–K indicated that in 1998 Baan changed its policy, recognizing only sales to end users. News reports indicated that Baan was "under fire for its aggressive accounting practices," and that there was confusion surrounding the relationship and transactions between Vanenburg, BBS, BMS, and Baan.

### Second Quarter 1998

In July 1998, Baan issued a press release regarding its second quarter earnings, reporting net income of $17.1 million. On August 31, 1998, Baan issued a press release announcing BMS' successes in building reseller relationships, resulting in market share gains. In September Baan filed its second quarter 6–K, which reflected total revenues of $230.08 million, and license revenue of $131.25 million. The form disclosed that the license revenue figure included $32.64 million from related parties, and repeated the disclosure from Baan's first quarter 1998 6–K regarding Baan's new method for recognizing revenue from indirect channel sales. Finally, the second quarter 6–K stated that Baan had charged Vanenburg $4.6 million for management information systems and marketing costs and services.

### Third Quarter 1998, and the End of the Class Period

On October 12, 1998, Baan disclosed a loss for the third quarter of 1998, and a material shortfall in revenue, and warned that the fourth quarter would be disastrous as well. On October 29 Baan issued a press release revealing that $23.1 million of its third quarter license revenue was from related parties. Baan also disclosed related party license revenue figures from the previous year: $16.2 million for the third quarter of 1997, and $26.7 million for the first three quarters of 1997 combined.

### Fourth Quarter 1998, and Beyond

On January 20, 1999, Baan issued a press release regarding the expected results from the fourth quarter of 1998. Baan announced its intention to reduce revenue by the amount of indirect channel sales which had not been sold to end users by the end of the third quarter of 1998. That amount was $50 million, and it included $17 million which had been sold by the end of the fourth quarter, and $33 million which remained unsold. On March 2, 1999, Baan issued a press release stating that total revenue for the fourth quarter was $131 million, resulting in a loss of $295 million for the company. The revenues for all of 1998 were $736 million, and the net losses for 1998 were $315 million. Among the charges contributing to the overall loss was a $56 million loss during the fourth quarter, spent to clear the indirect channel of existing inventory. According to the

Wall Street Journal, Baan said that it would defer $56 million in revenue to cover 1997 sales to affiliated indirect channel partners that were never sold to end users.

By the time plaintiffs filed their amended complaint in April 1999, Baan had filed neither its third quarter 6–K nor its annual 20–F for 1998. However, Baan's March 2 press release included its 1998 year end results, including related party revenue of $50.6 million for the year.[10]

## II. SUBJECT MATTER JURISDICTION

Many members of the plaintiff class, including two of the lead plaintiffs, are foreign nationals who purchased Baan stock on foreign exchanges.[11] The defendants contest this Court's jurisdiction over the claims by the foreign plaintiffs. Whether jurisdiction exists "over an action arising under the securities laws of the United States is a question of congressional intent, subject only to the broad limits set by the due process clause." *S.E.C. v. Banner Fund Intern.*, 211 F.3d 602 (D.C.Cir. 2000) (citing *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 29 (D.C.Cir. 1987)). The intent of the 1934 Act was to protect American investors and American markets. *See Zoelsch*, 824 F.2d at 31. Courts have employed two tests, the "effects" test and the "conduct" test, to determine whether jurisdiction exists over

extraterritorial transactions. Plaintiffs allege jurisdiction under both tests.[12] The conduct test may be satisfied by an allegation that fraud committed within the United States directly caused losses outside of the United States. *See Zoelsch*, 824 F.2d at 30. To satisfy the effects test, plaintiffs must allege that conduct outside of the United States has produced a substantial effect within the United States. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir.1972).

Defendants do not draw a distinction between the foreign plaintiffs who purchased their shares on foreign markets, and those who purchased their shares on American markets. However, a different analysis applies to these two groups, and they will be addressed separately.

### A. The Conduct Test

■ The conduct test requires that 1) all the elements necessary to establish a violation of section 10(b) and Rule 10b–5 must have occurred within the United States, and 2) those fraudulent actions in the United States must directly cause the plaintiffs' harm. *See Zoelsch*, 824 F.2d at 31. In their oppositions plaintiffs argue that much of the fraud took place in the United States, including the failure to adhere to GAAP, "deceptive disseminations," and "the channel misbehavior used by Baan to fraudulently boost reported sales

---

10. Plaintiffs contrast this figure with the $73.94 million in related party revenue already reported for the first three quarters of 1998.

11. Plaintiffs argue that defendants fail to draw a distinction between the foreign plaintiffs who purchased their shares on foreign markets, and those who purchased their shares on American markets. Although the captions in the defendants' motion refer to "the foreign plaintiffs," the plaintiff group at issue is more carefully defined within the body of the motion, where defendants contest jurisdiction over the claims of foreign plaintiffs "all of whom purchased Baan's stock on foreign exchanges." Baan's Motion to Dismiss at p.26. The defendants do not appear to challenge the application of the federal

securities laws to transactions that took place on American stock exchanges, nor could they do so successfully. The securities laws are intended to protect American markets, as well as American investors. *See Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 31 (D.C.Cir. 1987).

12. In fact, as the defendants point out, the complaint does not explicitly provide a "short and plain statement of the grounds upon which the Court's jurisdiction depends," as required by Fed.R.Civ.P. 8(a)(1). However, the Court will consider the arguments for jurisdiction contained in plaintiffs' oppositions to the motions to dismiss. Of course, any facts the plaintiffs rely on to demonstrate jurisdiction must be alleged in the complaint itself.

and revenues." However, for the most part the complaint fails to specify where the alleged fraud took place. The only fraudulent actions alleged in the complaint to have taken place in the United States are Baan's filing of forms with the SEC, and perhaps Baan's press releases.[13] To establish jurisdiction, plaintiffs must allege that Baan's filings with the SEC or other fraudulent actions in the United States were "a substantial or significant contributing cause of the decision to purchase stock." *In re Gaming Lottery Securities Litigation*, 58 F.Supp.2d 62, 73 (S.D.N.Y. 1999) (citing *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 92 (2d Cir. 1981) and *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 987 (2d Cir.1975)).

The complaint contains no allegations of specific reliance on those fraudulent acts which occurred in the United States. Instead, the complaint shows reliance through the "fraud on the market" doctrine. *See generally Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (rebuttable presumption that defendants' fraud caused plaintiffs' loss because "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business"). Defendants do not challenge the plaintiffs' reliance on that doctrine, as applied to American purchasers. However, employing that doctrine to fulfill the requirements of the conduct test would extend the reach of the 1934 Act too far. It would allow a foreign plaintiff to sue a foreign defendant based on an extraterritorial transaction whenever that foreign defendant had filed a fraudulently misleading document with

the SEC. Plaintiffs point to *Itoba Ltd. v. Lep Group, PLC*, 54 F.3d 118 (2d Cir. 1995), in which jurisdiction over an action by a foreign company was found where SEC filings constituted the only fraud in the United States. Plaintiffs' reliance is misplaced. In *Itoba*, the court relied on a combination of the effects test and the conduct test. Under the conduct test, Itoba alleged a specific, if somewhat indirect, chain of events showing that it relied on those SEC filings. The effects test was partially satisfied as well, because Itoba's parent corporation, which directed Itoba to purchase the stock, was American. Where, as here, plaintiffs fail to specifically allege that they relied on fraudulent SEC filings when purchasing stock, courts have not found jurisdiction. *See McNamara v. Bre–X Minerals Ltd.*, 32 F.Supp.2d 920, 925 (E.D.Tex.1999) (no jurisdiction where foreign plaintiffs did not allege that they relied on filings with the SEC); *Kaufman v. Campeau Corp.*, 744 F.Supp. 808, 810 (S.D.Ohio 1990) (same). Plaintiffs have not adequately alleged jurisdiction under the conduct test.[14]

### B. The Effects Test

In *Schoenbaum v. Firstbrook* the Second Circuit applied the general rule that jurisdiction exists over "acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it" within the context of the 1934 Act and the international securities markets. 405 F.2d 200, 206 (2d Cir.1968) (quotations and citations omitted). In *Schoenbaum*, foreign defendants purchased the stock of a Canadian company in Canada, but the court found that those sales had an effect on the American plaintiffs, who held stock

---

**13.** Baan's press releases were allegedly disseminated over the *"PR Newswire,"* whose location is not specified by the plaintiffs. The Court notes that the service is accessible via the internet.

**14.** Plaintiffs also attempt to satisfy the conduct test by alleging that Baan conducts a great deal of business in the United States, and that some of the individual defendants

are American. While those facts would be important to the issue of personal jurisdiction, they are irrelevant to subject matter jurisdiction. The conduct test requires that the fraudulent activity take place in the United States, and the fact that defendants conducted other activity in the United States is not significant.

in the Canadian company. There was an effect in the United States because the Canadian company's shares traded on an American exchange, and that was enough to confer jurisdiction.

The Second Circuit later addressed the application of the effects test where some of the plaintiffs were foreign, and some were American. In that case, the court found that where acts within the United States had not directly caused the plaintiffs' losses (i.e. the conduct test had not been satisfied), the federal securities laws applied to losses from sales to Americans resident in the United States, but not to losses from sales to foreigners outside the United States. *See Bersch,* 519 F.2d 974.[15] In this case, plaintiffs argue that the defendants' acts had an effect in the United States because Baan shares trade in tandem on the world's markets, and therefore the value of Baan's shares owned by United States residents was affected. More specifically, the shares owned by the American plaintiffs were affected. However, the *Bersch* court rejected the idea that generalized effects in the United States are sufficient to confer subject matter jurisdiction. The effects test only extends jurisdiction as to those American plaintiffs who are affected. *Id.* at 988–89. This case is different from *Bersch* in that the securities are traded on an American exchange. However, that fact only indicates there might be greater and more pervasive generalized effects in the United States; it does not show that those effects are related to the claims of the foreign plaintiffs. There is a presumption that congressional legislation "is meant to apply only within the territorial jurisdiction of the United States" *Zoelsch,* 824 F.2d at 31 (citation omitted), and that presumption has not been overcome in this case.[16]

## III. PLAINTIFF'S SECTION 10(b) CLAIM

Section 10(b) provides that it is unlawful:

> to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 is the implementing regulation for Section 10(b), and it provides that it is unlawful, in connection with the purchase or sale of a security:

> (a) To employ any device, scheme, or artifice to defraud.
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5. To state a claim under Section 10(b) a complaint must include six elements:

> (1) a material misstatement or omission, (2) scienter—an intent to deceive or defraud, (3) in connection with the purchase or sale of a security, (4) through the use of interstate commerce or a national securities exchange, (5) upon which plaintiffs relied, and (6) which caused injury to plaintiffs.

*In re Newbridge Networks Securities Litigation,* 767 F.Supp. 275, 281 (D.D.C.1991) (citing *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986)). As to the American plaintiffs, defendants challenge only the first

---

**15.** In *Banner Fund Int'l* the D.C. Circuit declined to either adopt or reject the *Bersch* test. The Court assumes, for the purposes of this opinion, that the *Bersch* test would be accepted.

**16.** The court declines to exercise supplemental jurisdiction over the claims of the foreign plaintiffs.

two elements required to state a 10(b) claim.

At this point in the proceedings, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Because a claim under 10(b) involves fraud, Fed.R.Civ.P. 9(b) requires the plaintiffs to state "the circumstances constituting fraud" with particularity. To satisfy the requirement under 9(b), plaintiffs must "state the time, place, and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1278 (D.C.Cir.1994) (citation and quotation omitted). The Private Securities Litigation Reform Act of 1995 (PSLRA) provides that where plaintiffs allege that the defendant made a misleading statement or omission, the complaint must specify each such statement or omission and explain why it is misleading. 15 U.S.C. § 78u–4(b)(1). The PSLRA also heightened the requirement for pleading scienter, so that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Baan, Grabe, Hodgson, Johnson, Tinsley and Wagenaar argue that the statements referenced by the plaintiffs are not misleading and were accompanied by disclosures and warnings, that Baan's accounting practices did not violate GAAP or SEC regulations, that plaintiffs fail to make the required specific allegations regarding each defendant's role, and that plaintiffs fail to allege scienter adequately. Jan Baan's motion incorporates all of the other motions to dismiss filed by other defendants, and raises the specific arguments that plaintiffs did not adequately allege scienter for Jan Baan, and that Jan Baan's "optimistic" statements do not support a 10(b) claim. Vanenburg argues that the plaintiffs have not specifically alleged any fraudulent actions on Vanenburg's part, and that scienter was not sufficiently plead.

### A. Material Misstatement or Omission

#### i. Statements by Individual Defendants

■ The defendants argue that many of the allegedly misleading statements were forward looking, or "mere puffery," and therefore not actionable. *See Kowal,* 16 F.3d at 1277 ("projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made"); *In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 535–36 (3d Cir.1999) (PSLRA created a safe harbor for forward looking statements made without "actual knowledge" that the statement was false or misleading; vague, general statements of optimism are not actionable, but mere 'puffery'). The Defendants are correct that some of the statements are not actionable. For example, Jan Baan was quoted in a Reuters interview, republished on Baan's website in November 1997, as saying that he saw "no constraints on growth," and that he expected Baan's annual revenue to grow to $2 billion within the next few years. *See* Complaint at ¶ 48.[17] Tinsley made general,

---

**17.** Another instance of "puffery" was a quote from Jan Baan in a January, 1998, *AFX News* report that it was possible sales would reach $1 billion in 1998. The same article quoted Jan Baan's comments at a news conference which followed the announcement of the year end results for 1997: "[a]nalysts expect us to report sales of 1 billion dollars this year, and there is indeed a chance we will. There is also a chance that ratios will improve." Regarding long term growth, Jan Baan cited studies indicating that by 2002, Baan would be the number one maker of ERP software in the world, and number two in the U.S. *See* Complaint ¶ 54. Jan Baan also gave strong sales figures for several countries, and said "[i]f we had placed 300[R & D] employees elsewhere, sales would have been 50–60 mil-

positive, often forward looking comments such as "[o]ur strong momentum continued in the first quarter, reflecting the high demand for our products in the global marketplace," Complaint at ¶ 40 (April 1997 press release), "[d]uring the past several quarters, we have put in place a number of global initiatives which will enable Baan to sustain its continued growth," *id.* at ¶ 44 (July 1997 press release), and

> Baan Company's business performance continues to develop according to our plan to be the technology product company that defines the new growth market for high-volume, packaged enterprise applications. The results validate the success of our strategy to provide the broadest portfolio of enterprise applications to address the core business processes common to companies of all sizes and industries, and deliver these products through both direct and indirect distribution channels . . .

*Id.* at ¶ 95 (July 1998 press release).[18] These vague, positive, and forward looking statements are not adequate basis for a Section 10(b) claim.

■ A couple of the statements attributed to Jan Baan were more specific.[19] In

November 1998, the Wall Street Journal quoted Jan Baan as commenting in an interview from the previous June that "[t]here is no borrowing against shares, because there is no reason [for such borrowing]." *See* Complaint at ¶ 10. However, plaintiffs allege that Vanenburg took out a loan using its Baan shares as collateral, and that Vanenburg funneled that money back to Baan. Plaintiffs also allege that during February, 1998, Jan Baan was quoted as saying that Baan had expanded its global market share, and would continue to outpace market growth. Although part of that is a forward looking statement, Jan Baan's "good faith" in making that statement is called into question given plaintiffs' allegation that Baan was in fact losing market share during 1997 and 1998. The statements regarding Vanenburg's loan and Baan's market share specifically misstated facts relevant to Baan's financial health, and were thus materially misleading.

■ An April 1998 *TechWeb News* article quoted a written statement by Tinsley: "[d]ue to uncertainty in the new American guidelines for revenue recognition, we have decided, in consultation with the Au-

---

lion dollars higher. But this proves that we are not just thinking short-term." *See* Complaint at ¶ 56.

18. Plaintiffs also attribute certain statements to Wagenaar. For example, in May 1998 *Computergram International* reported Wagenaar's comment to Reuters that the $43 million in income Baan deferred during the first quarter of 1998 would be gradually added back in over the second quarter, and would take up to two years to recognize. *See id.* at ¶ 84. This is a forward looking statement, and plaintiffs have not adequately alleged that Baan did not intend to gradually account for the deferred income in that fashion. In a January, 1998 *AFX News* report regarding prospects for Baan's growth in 1998 and on through 2002, Wagenaar was quoted as saying that Baan had experienced "little impact" from the "crisis in Asia." *See id.* at ¶ 54. The Court has no information before it regarding how, or if, the "crisis in Asia" has any relevance to either Baan or this litigation.

19. Defendants argue that news articles which fail to quote directly any defendant or Baan representative may not serve as a basis for a 10(b) claim. Defendants have not addressed the issue of articles which include quotes, however, and the Court will not reach the issue either. The Court notes, however, that the courts are divided as to whether quotations are generally actionable. *See In re Newbridge Networks Securities Litigation*, 926 F.Supp. 1163, 1171 (D.D.C.1996) (plaintiffs must allege that defendants had some control over the final version of the article, because spokespersons might be quoted inaccurately or out of context); *In re Gupta Corp. Securities Litigation*, 900 F.Supp. 1217, 1237 (N.D.Cal.1994) (same); *In re Columbia Securities Litigation*, 747 F.Supp. 237, 245 (S.D.N.Y.1990) (quotation actionable where plaintiffs alleged defendant actually made that statement); *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 265 (2d Cir.1993) (distinguishing unattributed statements from those in *In re Columbia* ).

dit Committee, to take the position that we should defer several contracts we initially felt would be in line with SOP 97–2." *See* Complaint at ¶ 67. Plaintiffs argue that this statement was misleading because Tinsley knew that Baan's policy in 1997 had been to recognize revenue from channel sales that were not final, in violation of GAAP. Tinsley's statement provides a purported explanation for the decision to defer the recognition of revenue from certain contracts. Assuming that plaintiffs' allegations are true, Tinsley's failure to acknowledge that it had been Baan's policy to recognize revenue based on this type of contract, and that this policy had been in violation of GAAP requirements, constituted a materially misleading omission.

### ii. GAAP Violations

■ The bulk of the plaintiffs' allegations of fraud are based on Baan's SEC filings and press releases. In its filings with the SEC, Baan reported revenue figures plaintiffs allege were fraudulently generated in violation of GAAP. Baan's press releases also reported earnings and included claims about Baan's growth which were derived from the same allegedly fraudulent revenue recognition policies. *See, e.g.,* Complaint at ¶ 52 (January 29, 1998 press release reporting 65% increase in net revenue for the year, strong demand for Baan's products resulting in 82% growth of license revenue, etc.). In order for these statements to be actionable as to each defendant, plaintiffs must specify why the statements were misleading, and attribute the statements to each defendant.

Defendants argue that Baan did not recognize revenue from consignment sales in violation of GAAP. First, defendants contest the alleged nature of the indirect channel sales, objecting to plaintiffs' characterization of those sales as "consignment sales." Plaintiffs allege that Baan offered generous rights of return, and support that allegation with evidence of Baan's subsequent pattern of deferring revenue. Plaintiffs have plead specifically that Baan

recognized revenue from sales in 1997 that it was forced to defer in 1998 because those sales had not resulted in final sales to consumers. Whether those 1997 sales were "consignment" sales or were final enough to be counted as revenue is a factual dispute which cannot be settled at this stage in the proceedings. Second, defendants argue that the recognition of that revenue did not violate GAAP. They argue that under SOP 91–1, such recognition was appropriate. They admit that SOP 97–2 placed the propriety of Baan's recognition policy in doubt, but Baan changed that policy when the new SOP became effective. However, the complaint quotes extensively from GAAP rules which were in place well before SOP 97–2 became effective, and which appear to require a substantial degree of finality before a company may recognize revenue from sales. *See, e.g.,* Complaint ¶ 123 –29. Plaintiffs have sufficiently alleged that Baan's practices violated GAAP.

Defendants also argue that GAAP violations are not a sufficient basis for a 10(b) claim. It is true that when a company's filings with the SEC fail to comport entirely with GAAP, the company is not automatically liable under 10(b). *See In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 553 (6th Cir.1999) (failure to follow GAAP does not, by itself, establish a securities fraud claim, because plaintiffs must also show scienter). However, the existence of a GAAP violation may play a significant role in determining whether there is a cause of action under 10(b). "The Financial Accounting Standards of GAAP and the anti-fraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." *Simpson v. Specialty Retail Concepts, Inc.,* 908 F.Supp. 323, 328 (M.D.N.C.1995). Stock analysts expect companies to follow SEC and GAAP rules; indeed, Baan's filings with the SEC specifically stated that Baan complied with GAAP. If Baan violat-

ed GAAP rules, the financial information Baan published would have been misleading to anyone attempting to analyze the value of Baan's stock.

Where alleged GAAP violations have involved the substantial overstatement of revenue by the reporting of consignment transactions as sales, they have sometimes been found sufficient to support an action under 10(b) and Rule 10b–5. *See, e.g., Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.1994) (pre-PSLRA case, citing cases where this type of GAAP violation has been found to be a 10(b) violation, and failing to "find a single precedent" to the contrary); *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir.1997) (pre-PSLRA case holding that a "company that substantially overstate[s] its revenues by reporting consignment transactions as sales . . . mak[es] false or misleading statements of material fact") (citation and quotation omitted); *Bell v. Fore Systems, Inc.* 17 F.Supp.2d 433, 437 (W.D.Pa.1998) (reporting sales of inventory that had merely been "parked" with resellers was a violation of both GAAP and 10(b)). Plaintiffs have alleged that Baan violated GAAP by prematurely and improperly recognizing revenue from consignment sales, and they have thereby adequately plead the existence of a materially misleading statement or omission.

*Warnings and Disclosures*

The defendants argue that any misleading statements were corrected and rendered harmless by the warnings and disclosures Baan made to the public. They argue both that the public was already aware of the channel sales at issue, and that Baan's warnings about the "highly competitive nature of the ERP Software market" rendered the allegedly misleading statements and omissions immaterial. Baan correctly notes that the "bespeaks caution" doctrine requires courts to consider alleged misstatements and omissions in the context of the warnings issued by the defendant. *See, e.g., In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 364 (3d Cir.1993), *cert. denied.*

510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) (granting a motion to dismiss because alleged mistakes and omissions in prospectus were rendered nonactionable by disclosures contained in the same prospectus). The warnings were included in the documents plaintiffs rely on in their complaint, making it proper for the Court to consider them, even at this early stage in the litigation.

■ The warnings Baan refers to were general in nature. For example, Baan's SEC filings include warnings that Baan was involved in a highly competitive industry. These warnings were relevant, and Baan points out that the drop in its stock value which constituted the plaintiffs losses was part of an overall slowdown in the enterprise business software market. However, general warnings about the competitive and volatile nature of the industry did not alert the public to Baan's practice of recognizing questionable revenue, nor did they render Baan's failure to disclose that practice immaterial.

In addition to these general warnings, part way through the class period Baan disclosed to the public certain information which was more specifically relevant to the potentially misleading statements. If the misleading statements and omissions were thus corrected in a timely manner, they would not be actionable.

■ During 1998, Baan made disclosures regarding its recognition of revenue from indirect channel sales. On April 21, 1998, Baan issued a press release announcing, among other things, a decision to defer certain revenue in the first quarter of 1998. Baan did not specify what revenue would be deferred, indicating only that due to the replacement of SOP 91–1 with SOP 97–2, revenue from "software delivered under certain signed contracts even though they may have been paid in full" would no longer be recognized. Complaint at ¶ 66. That information did not put the public on notice as to the specifics of either Baan's prior policy or its new one. In its July

1998 6–K, Baan specified that its practice in 1997 had been to recognize indirect channel sales at the time of shipment, and its new policy was to recognize only sales to end users. However, Baan stated that under its 1997 policy sales were recognized only after an evaluation of the reseller's existing inventory, and gave no indication that those sales were not final. Based on the plaintiffs' allegations that these were essentially consignment sales to overstocked resellers, Baan's disclosure was not sufficiently complete.

Even if by July 1998 Baan had adequately disclosed its 1997 policies, plaintiffs further allege that Baan made misstatements regarding its practice of revenue recognition in 1998. Baan announced in July 1998 that under its 1998 recognition policy, only sales to end users were being recognized. Baan ultimately issued a March 2, 1999, press release revealing an expenditure of $56 million to clear the indirect channel of existing inventory. According to a March 3, 1999, Wall Street Journal article, Baan said that it was deferring the $56 million in revenue to cover sales which had been recognized in 1997 despite the fact that they were made to resellers, not to final users, so that the product remained as inventory in the indirect channel. No equivalent final accounting is available for 1998, but the plaintiffs do provide some evidence that Baan did not comply with its stated policy of only recognizing sales to end users in 1998. In its statements regarding earnings for the first, second, and third quarters of

1998, Baan specifically revealed the amount of license revenue it had received from related parties.[20] Plaintiffs argue that Baan used its relationship with these channel sellers to fraudulently boost its revenue. In its March 2 press release, Baan announced that revenue from related parties had been $50.6 million for the entire year. However, in its quarterly reports to the SEC, Baan had already reported related party revenue of $73.94 million for the first nine months of 1998. This disparity suggests that Baan may have had to reverse its recognition of some of the related party revenue. These related parties were Baan's indirect channel partners, and the facts plaintiffs allege raise an inference that the 1997 pattern of shortfall due to recognizing non-final sales may have continued into 1998. The warnings Baan issued were not complete or timely enough to negate the plaintiffs' allegations of fraud.

### Group Pleading Doctrine

To show direct liability under 10(b), plaintiffs must allege that each defendant has made a material misstatement or omission. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (making a material misstatement or omission violates 10(b), but aiding, abetting, or conspiring to do so does not). Baan's responsibility for its own SEC filings and press releases is clear. Plaintiffs directed their allegations regarding the SEC filings and press releases to "each of the defendants,"[21] but merely stating that

---

20. Baan argues that this disclosure, along with the others it made, should insulate it from liability. However, although the information provided the public with a piece of the puzzle, simply reporting that certain revenue was from related parties did not reveal Baan's alleged policy of recognizing revenue from non-final sales. Baan did not disclose the amount of its license revenue from related parties for the first three quarters of 1997 until the end of the class period, October 12, 1998, although even if provided in a more

timely manner, the information would only have been of the same limited use as the 1998 figures.

21. Plaintiffs occasionally state in their complaint that a statement was made "by the individual defendants," without explaining why they attribute the statement to those individuals. *See, e.g.*, Complaint at ¶ 52 (attributing a press release regarding fourth quarter 1997 earnings to the "Individual Defendants" as a group); *Id.* at ¶ 64 (same, regarding first

all defendants were responsible for all of the misleading statements or omissions does not satisfy the requirements of the PSLRA. Plaintiffs must plead with specificity.

█ Plaintiffs argue that all of the defendants are liable for the misstatements discussed in this section under the "group pleading" or "group published" doctrine. This doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" *In re Oxford Health Plans, Inc., Securities Litigation,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (quoting *In re Stratosphere Corp. Securities Litigation,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998)). Defendants argue that this doctrine is no longer viable in light of the heightened requirements of the PSLRA. However, many courts have continued to rely on the group pleading doctrine, and this Court does not find that doctrine incompatible with the PSLRA. *See, e.g. In re Oxford Health Plans, Inc., Securities Litigation,* 187 F.R.D. at 142; *In re Livent, Inc., Securities Litigation,* 78 F.Supp.2d 194, 219 (S.D.N.Y.1999); *In re BankAmerica Corp., Securities Litigation,* 78 F.Supp.2d 976, 987 (E.D.Mo.1999); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 627 n. 4 (N.D.Tex.1998); *Robertson v. Strassner,* 32 F.Supp.2d 443, 446 (S.D.Tex.1998); *In re Digi Intern., Inc., Securities Litigation,* 6 F.Supp.2d 1089, 1101 (D.Minn.1998); *but see Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103 (E.D.Pa.1999) (group pleading is inconsistent with the PSLRA's purpose, and did not survive); *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998) ("The PSLRA codifies a ban against group pleading").

A number of the actionable statements are "group published" documents, including Baan's reports to the SEC, and its press releases. Courts often describe the group pleading doctrine as applying to high-level corporate officers and directors generally. *See, e.g., In re Newbridge Networks Securities Litigation,* 926 F.Supp. 1163, 1174–75 (D.D.C.1996) (in context of a 20(a) claim); *In re Newbridge Networks Securities Litigation,* 767 F.Supp. 275, 282 n. 12 (D.D.C.1991) (relying on group published doctrine in combination with details in complaint which specified when, where, and by whom statements were made); *Zuckerman,* 4 F.Supp.2d at 626 n. 4. However, the mere fact that the individual defendants are officers does not permit plaintiffs to attribute those statements to them. Especially where plaintiffs are relying exclusively on the doctrine to establish 10(b) liability, courts tend to be more selective about which individual defendants qualify. For example, the group may include "individuals with direct involvement in the everyday business of the company." *In re Stratosphere Corp. Securities Litigation,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998). In *Stratosphere,* the individual defendants had high-level positions with the company, were directly involved in its management and day-to-day operations, were privy to confidential information, and were involved in drafting, reviewing, or disseminating the misleading statements. *Id.; see also In re Oxford Health Plans, Inc., Securities Litigation,* 187 F.R.D. at 142 (the individual defendants were officers or directors who drafted, reviewed, or disseminated the misleading statements). Another court distinguished between outside directors and officers, presuming that the doctrine does not apply to outside directors "unless plaintiffs allege specific facts to show that these individuals had direct involvement in the day-to-day affairs of the corporation or that they were involved in preparing or

quarter 1998 results). Those statements are discussed *infra* in the section entitled "Group

Pleading Doctrine".

communicating group information at particular times." *In re BankAmerica Corp. Securities Litigation*, 78 F.Supp.2d at 987; *cf. In re Livent, Inc. Securities Litigation*, 78 F.Supp.2d. at 219 (group pleading doctrine applied to outside directors who were members of the audit committee, and thus responsible for reviewing the company's reporting procedures and management information systems). Plaintiffs must identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements. *See In re MDC Holdings Securities Litigation*, 754 F.Supp. 785, 795 (S.D.Cal.1990).

■ In this case, plaintiffs have shown that defendants Jan Baan, Wagenaar, Tinsley, and Johnson are responsible for the filings and press releases published by Baan. Jan Baan founded Baan, served as its CEO through most of the class period, and was a managing director. Further, his statements regarding several of the group published documents indicate his involvement and knowledge of their contents and publication. Tinsley was COO until he became CEO and chairman of the board of managing directors in July 1998. Wagenaar was senior vice president and CFO until he became COO in April 1998. Both were members of the audit committee. *See* Complaint at ¶ 16 & 17; Baan's Motion to Dismiss at p.8. In addition, Wagenaar signed at least one of the materially misleading statements, including Baan's 1997 20–F. Johnson was appointed executive vice president of Baan Affiliates & Marketing and acting managing director of Baan in January 1997, and became responsible for the Baan Supply Chair Division in January 1998. *See* Complaint at ¶ 21; Baan's Motion to Dismiss at 8. Plaintiffs have adequately alleged that all of these officers were high level officials involved in the day-to-day business of the company.

■ Plaintiffs have not adequately alleged that the other individual defendants were responsible for Baan's group published statements. Grabe and Hodgson were not officers, but merely members of Baan's board of supervisory directors and its audit committee. Likewise, Paul Baan was not an officer or a managing director during the time Baan issued the misleading group published statements, although he was chairman of the board of supervisory directors during much of that time, and he had a management role with regard to Vanenburg. An outside director is not necessarily involved in the day-to-day business of running a company. Their positions as directors are not enough to bring them within the scope of the group pleading doctrine, and plaintiffs have not alleged any specific facts illustrating the involvement of these defendants in the drafting, reviewing, or dissemination of Baan's group published statements. Plaintiffs have not adequately plead allegations of liability under Section 10(b) as to Hodgson, Grabe, or Paul Baan.

Finally, plaintiffs cite no authority indicating that the liability of another company, even a related company with an ownership interest and overlapping officers and directors, may be premised on group published information. *Cf. Lindblom v. Mobile Telecommunications Technologies*, 985 F.Supp. 161, 163 (D.D.C.1997) (a wholly owned corporate subsidiary is not liable for its parent corporation's statements, nor is it liable as an aider, abettor, or co-conspirator). Vanenburg is not an officer or director of Baan, and plaintiffs have not shown that it played any role in the drafting or publication of Baan's misleading statements. Plaintiffs did not adequately plead a violation of Section 10(b) by Vanenburg.

## B. Scienter

Scienter is a required element that must be plead in alleging a violation of § 10(b).[22]

---

22. Scienter is critical for the claims against Baan, Wagenaar, Tinsley, Johnson, and Jan

Baan, as those are the defendants against whom the plaintiffs have adequately plead a

The PSLRA does not refine the definition of scienter any further, but it does require plaintiffs to plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). There is no consensus among the courts as to how a "strong inference" of scienter may be established, and our Circuit has yet to rule on the issue. Plaintiffs argue that they may satisfy the scienter requirement by alleging facts to show either (1) that the defendants had motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *See Press v. Chemical Invest. Services Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (approving both the recklessness test and the motive and opportunity test); *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 534–35 (3d Cir.1999) (same); *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1252–53 (N.D.Ill.1997) (same); *Williams v. WMX Technologies, Inc.* 112 F.3d 175, 178 (5th Cir.1997) (noting, in dicta, that the PSLRA adopted the Second Circuit standard); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196–98 (1st Cir.1999) (rejecting the Second Circuit's approach in favor of one closer to that of the Sixth Circuit (rejecting the motive and opportunity test), but finding that facts showing motive and opportunity can sometimes support scienter).

### i. Motive and Opportunity

■ Defendants argue that under the PSLRA, a showing of motive and opportunity is insufficient to support scienter. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir.1999); *In re Comshare*, 183 F.3d at 551; *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 979 (9th Cir.1999). Even assuming that a showing of motive and opportunity would satisfy the PLSRA's requirement for pleading scienter, plaintiffs have

not alleged facts sufficient to show motive and opportunity.

Plaintiffs argue that stock sales by Grabe, Hodgson, and Johnson provide those defendants with motive. Grabe and Hodgson sold 40,000 shares each when Baan stock was worth about $45 per share. Two partnerships of which Grabe and Hodgson were members sold a combined total of about 559,000 shares the same month. Johnson sold 50,000 ADRs in August 1998. Insider sales "in suspicious amounts or at suspicious times" can be evidence of scienter. *See, e.g., In re Newbridge Networks*, 926 F.Supp. at 1174 (pre-PSLRA case) (citations and quotation omitted). However, plaintiffs have not provided enough information about these sales to make them sufficient evidence of motive in themselves. Plaintiffs do not indicate what percentage of their stock each defendant (or partnership) sold, or whether these sales were in keeping with the defendants' prior history of stock sales. *See generally In re Advanta*, 180 F.3d. at 540–41 (although stock sales by defendants sometimes support an inference of scienter, the court must first consider the percentage of stock sold, past trading practices, and whether all of the defendants sold stock); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (sale by one defendant of less than 11% of his holdings did not show scienter); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1313 (C.D.Cal.1996) (the insider trading activity must be "unusual," such as the sale of 20% of a defendant's holdings, where she had not made any such sales in three years). The stock sales alleged by the plaintiffs are not unusual enough to support an inference of motive by themselves.

Plaintiffs base their argument regarding Jan Baan's motive on a $500 million loan which Vanenburg obtained by using its

---

violation of 10(b). However, defendants argue that scienter is required for claims under 20(a) as well. The Court addresses that issue in the section on 20(a) control person liability,

but for now will address the knowledge of each defendant as to the existence of the various fraudulent misstatements and omissions alleged.

Baan stock as collateral. The loan does appear suspicious, in part because Jan Baan reportedly denied, in an interview with the Wall Street Journal in June 1998, that Baan shares were used as collateral. However, although plaintiffs indicate that Jan Baan borrowed the money "through" Vanenburg, they do not indicate that he used the money for personal gain. Instead, they allege that the money was funneled from Vanenburg to Baan through the purported consignment sales and "informal cost sharing arrangements." Both Jan Baan and Vanenburg would presumably have benefitted indirectly, as shareholders of Baan. This connection is too tenuous to show motive on either Jan Baan or Vanenburg's part.

■ Finally, plaintiffs make general allegations regarding all of the defendants collectively. They allege that the defendants wanted to "maintain their positions with Baan," and "maintain Baan's competitive position with respect to competitors." These allegations of motive would apply to virtually all, if not all, executives and companies, and are insufficient to establish that any of the defendants had the requisite motive.[23] *See generally Acito,* 47 F.3d at 54; *Chill v. General Electric Co.,* 101 F.3d 263, 268 (2d Cir.1996); *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1414 (S.D.N.Y.1996).

ii. Reckless or Conscious Behavior

■ Plaintiffs make a stronger case regarding scienter based on recklessness. They must set forth "facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta,* 180 F.3d at 534–35 (quoting *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3rd Cir.1997)); *see also Malone v. Microdyne Corp.,* 26 F.3d 471, (4th Cir.1994) (pre-PSLRA case; "[p]roof of scienter need not be direct, but may be inferred

from circumstantial evidence."). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3rd Cir.1979)); *see also In re Comshare,* 183 F.3d at 549–50 (requiring plaintiffs to allege "facts that give rise to a strong inference of reckless behavior," and defining recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.") (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)).

■ Scienter must be plead as to each defendant. *See Lindblom,* 985 F.Supp. at 163 (plaintiffs must state with particularity the inference of scienter as to each misleading statement attributable to each defendant). Some of the plaintiffs' allegations apply to all of the defendants. Plaintiffs allege that the nature of the purported GAAP violations themselves provide evidence of scienter. Defendants correctly point out that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Lovelace v. Software Spectrum, Inc.* 78 F.3d 1015, 1020 (5th Cir.1996) (citations and internal quotations omitted); *see also In re Comshare* 183 F.3d at 553 (finding no scienter where plaintiffs had not "alleged specific facts that illustrate "red

---

**23.** Plaintiffs also alleged that Baan used its "inflated securities price as currency to close several significant acquisitions during the Class Period." Plaintiffs fail to give any ex-amples of such acquisitions, however, and a much stronger case for Baan's scienter is made under the recklessness standard.

flags" that should have put Defendants on notice of the revenue recognition errors"). Although GAAP violations cannot be directly equated with scienter, courts have found GAAP violations to be extremely probative of scienter. "A violation of GAAP, combined with other circumstances suggesting fraud, may create a strong inference of scienter." *In re Digi Intern., Inc. Securities Litigation,* 6 F.Supp.2d 1089, 1099 (D.Minn.1998) (citations omitted); *In re Miller Industries, Inc. Securities Litigation,* 12 F.Supp.2d 1323, 1331(N.D.Ga.1998) (same); *In re Ancor Communications, Inc. Securities Litigation,* 22 F.Supp.2d 999, 1004 (D.Minn. 1998) (same); *see also In re Discovery Zone Securities Litigation,* 943 F.Supp. 924, 937 (N.D.Ill.1996) (finding scienter based on a combination of GAAP violations and the defendants' stock sales, but stating in dicta that the GAAP violations alone supported an inference of scienter). It has been noted that "the Financial Accounting Standards of GAAP and the anti-fraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." *Simpson,* 908 F.Supp. at 328 (in a pre-PSLRA case, permissible to draw inferences regarding scienter from a GAAP violation).

Specific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter. For example, the magnitude of the error can play a role. *See, e.g., Rehm,* 954 F.Supp. at 1257; *Marksman Partners,* 927 F.Supp. 1297. GAAP violations are less indicative of scienter when, by their nature, the violations could easily be inadvertent. For example, if the violation was the failure to detect an inaccuracy. *See, e.g., Chill,* 101 F.3d 263 (where GAAP violation was a parent corporation's reporting of fictitious profits due to a subsidiary's failure to de-

tect secret, fraudulent transactions by one of its traders).

In contrast, violations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter. *See, e.g. Bell v. Fore Systems, Inc.* 17 F.Supp.2d 433, 439 (W.D.Pa.1998) (allegation that defendants knowingly engaged in an "inventory parking scheme" and improper accounting practices in order to recognize revenue in violation of GAAP was sufficient to show scienter); *Malone,* 26 F.3d at 479 (denying defendants' motion for summary judgment on allegation that defendants reported revenue from sales despite the fact that company officials were aware of "generous return privileges" and knew that a large fraction of the products actually were returned); *Marksman Partners,* 927 F.Supp. 1297 (recognition of revenue from sales of goods where the defendants were aware of the buyer's right of return helped support an inference of scienter). In one case, the defendants were alleged to have recognized revenue despite the fact that they knew their product was not compatible with the buyer's components, and the buyer could return the products if it was impossible to integrate the items. The court found that this alleged GAAP violation showed the defendants' scienter, and relied on a strong inference that a company and its key officers would be aware of facts critical to important transactions. *In re Ancor,* 22 F.Supp.2d at 1005. In this case, because Baan relied heavily on its channel sales to meet its projections of growth, there is a strong inference that Baan and its principal officers, including Jan Baan, Johnson, Tinsley, and Wagenaar, were aware of Baan's policy regarding rights of return by its channel partners.[24] The plaintiffs also allege that Baan was responsible for the

24. Baan's extensive reliance on channel sales was intentional. *See* 1997 20–F at p.12 ("during 1996 and 1997, the company made strategic decisions to increase the proportion of its sales which are generated and managed through indirect channels").

management information systems of its related channel partners. They base this allegation on the fact that Baan was reimbursed for its costs regarding those systems. This supports the idea that Baan itself was aware of its partners' failure to resell the merchandise to end-users.

The plaintiffs do not rely exclusively on the alleged GAAP violations themselves to establish an inference of scienter. Plaintiffs allege that by nature of their high level positions, the individual defendants were involved in Baan's operations and had access to information. As discussed earlier, Jan Baan, Johnson, Tinsley, and Wagenaar were involved in Baan's day-to-day operations. Paul Baan, Grabe, and Hodgson were members of the Board of Directors, although not company officers. Grabe and Hodgson's membership in the Audit Committee also suggests that they may have been aware of Baan's accounting policies. *See In re MTC Electronic Technologies Shareholders Litigation*, 898 F.Supp. 974, 980 (E.D.N.Y.1995), *reconsideration of unrelated issue*, 993 F.Supp. 160 (E.D.N.Y.1997) (in accounting fraud case, considering directors' membership on audit committee in finding scienter); *but see In re Health Management, Inc., Securities Litigation*, 970 F.Supp. 192, 205 (E.D.N.Y. 1997) (membership on the Board of Directors is insufficient to establish the requisite scienter).

Certain statements by Tinsley and Wagenaar further suggest they were aware, or had reason to be aware, of Baan's policies regarding channel sales and the recognition of revenue from those sales. For example, in May 1998 two publications printed quotes from Wagenaar regarding Baan's implementation of SOP 97–2, transactions with affiliates, and the decision to defer $43 million in income during the first quarter of 1998. Tinsley was quoted in an April 1998 article regarding efforts to bring Baan into compliance with revenue recognition standards, including SOP 97–2. Wagenaar and Tinsley's roles as Baan's representatives on these accounting and sales issues support an inference that they were familiar with Baan's revenue recognition policies, including those alleged to violate GAAP and Section 10(b). Wagenaar was quoted in another article, also published in May 1998, which accused Baan of having recognized revenue from software that had not actually been sold. A person in Wagenaar's position could reasonably be expected to investigate such an allegation, thereby becoming informed about Baan's revenue recognition policies, if he was not already aware of them.

Jan and Paul Baan's involvement in both Baan and Vanenburg, the parent company of many of Baan's channel partners, gave them exposure to both sides of the sales transactions at issue and increased the chance that they were aware of sales policies such as rights of return. To have been aware of the alleged fraud, however, they would have had to be familiar with Baan's revenue recognition policies as well as the nature of the sales transactions generating revenue at issue. Jan Baan's level of involvement in Baan was great enough to support an inference that he knew of its accounting method regarding revenue recognition. Paul Baan and Vanenburg's roles in Baan were much less extensive. However, the complaint alleges an intentional, fraudulent, scheme which required the assistance of Vanenburg and its subsidiaries. According to the plaintiffs, the channel partners purchased large quantities of goods from Baan, knowing that they were unlikely to sell those products, and knowing that they could return those products. Assuming that plaintiffs' allegations are correct, as the Court must, it is reasonable to infer that Paul Baan and Vanenburg were aware of Baan's interest in their purchase of these goods.

Finally, plaintiffs regard stock sales by Grabe, Hodgson, and Johnson as insider trading supporting an inference of scienter. As discussed earlier, the stock sales, viewed alone, did not supply the motive necessary to satisfy the motive prong of the "motive and opportunity" test. Plain-

tiffs provide no information regarding what percentage of his stock each defendant sold, however, or the sellers' history of stock sales. The sales may be considered in combination with other indicia of scienter, although they fall short of establishing scienter in themselves. *See infra,* discussion and citations in section II(B)(ii).

In combination, plaintiffs' allegations are sufficient to support a strong inference of recklessness or knowledge on the part of each defendant. The jury has a preeminent role in deciding whether or not scienter has been established. *Simpson,* 908 F.Supp. at 329 (pre-PSLRA case). Plaintiffs' pleadings are sufficient to survive the motion to dismiss.

*IV. Section 20(a) Control Person Liability*

Plaintiffs allege that defendants Baan, Jan Baan, Paul Baan, Vanenburg, Tinsley, Wagenaar, Grabe, and Hodgson are liable as control persons under Section 20(a).[25] Jan Baan, Vanenburg, and Paul Baan [26] have argued that they are not control persons. Baan, Wagenaar, Tinsley, Grabe, and Hodgson contest their liability under 20(a) based only on the argument that the plaintiffs failed to establish Baan's underlying 10(b) liability. Defendants are correct that control person liability under 20(a) is contingent upon showing direct 10(b) liability of the controlled entity. *See, e.g., Robbins v. Moore Medical Corp.,* 894 F.Supp. 661, 668–69 (S.D.N.Y.1995). However, plaintiffs have adequately plead Baan's 10(b) liability. Defendants Baan, Tinsley, Wagenaar, Grabe, and Hodgson's arguments against their 20(a) liability are therefore rejected, and this section will address Vanenburg, Paul Baan, and Jan Baan's status as control persons.

 Section 20(a) provides:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In the SEC's regulations, control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Some courts have required plaintiffs to show that the defendants "culpably participated" in the underlying fraud. *See SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). However, the language of the statute suggests that once plaintiffs have established the defendants' ability to control, it becomes the defendants' burden to show that they did not participate in the fraud, and that they acted in good faith. *See Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985) (rejecting *Rochez Bros.*); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990) (where control person is a broker-dealer, no need to show culpable participation); *but see Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987) (requiring culpable participation). Requiring plaintiffs to establish more would erode the distinction between direct liability under 10(b) and control person liability under 20(a). *See G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 n. 23 (5th Cir. 1981).[27]

---

**25.** Johnson is the only defendant not alleged to be a control person.

**26.** Paul Baan did not file a motion to dismiss pursuant to Rule 12(b)(6), but in his motion filed pursuant to Rule 12(b)(2) he adopts all

arguments included in the other defendants' motions.

**27.** As noted earlier in the discussion of scienter, there is dispute as to whether scienter is a prerequisite for 20(a) control person liability.

Plaintiffs must show that Vanenburg, Jan Baan, and Paul Baan had the ability to control the allegedly fraudulent transactions, although they are not responsible for showing that such power was actually exercised. *See In re System Software Associates, Inc. Securities Litigation,* 2000 WL 283099 (N.D.Ill. March 8, 2000). Whether the defendants possessed this power is "an intensely factual question." *Paracor Finance Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996).

Jan Baan founded Baan, and his brother Paul Baan joined the company four years later. Through Vanenburg they owned about 39% of Baan at the end of the relevant time period. These allegations are not sufficient to show control in themselves, but they are significant factors. *See Sloane Overseas Fund v. Sapiens Int'l Corp.,* 941 F.Supp. 1369, 1378 (S.D.N.Y. 1996) (control can be inferred from substantial stock ownership, but 8% is not enough); *Copland v. Grumet,* 1998 WL 256654 (D.N.J. Jan. 9, 1998) (Stock ownership does not show control where defendants own only 12% and are not controlling shareholders); *cf. Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988) ("status as an officer, director or shareholder, absent more, is not enough to trigger liability under § 20"). Plaintiffs point out that the 1997 Form 20–F Baan filed with the SEC contains the admission that Jan and Paul Baan "may be deemed to have control over the management and affairs of the Company." 1997 20–F at 46. Jan Baan was the CEO for most of the relevant period, and his active role in the management of Baan can also be inferred from his statements to the press regarding Baan's sales figures, market share, and prospects for growth. Plaintiffs' allegations constitute a sufficiently particularized pleading of Jan Baan's control person status.[28]

During the relevant time period, Paul Baan was a member of Baan's board of supervisory directors, although was not a corporate officer with direct authority over the company's day-to-day operations. *See generally King v. E.F. Hutton & Co.,* 1987 WL 8733 (D.D.C. Mar.13, 1987) ("directors of a corporation may be found liable as controlling persons"). Paul Baan had previously served as Baan's COO, and was vice chairman, managing director, and president of Baan until he resigned in April 1996. Vanenburg is controlled by Paul and Jan Baan, and owns a large percentage of Baan's stock. Vanenburg and its subsidiaries are Baan's business partners, and Baan and Vanenburg jointly own a group of subsidiaries. Plaintiffs argue that Baan, Vanenburg, and Paul and Jan Baan are all alter egos of one another. Despite the strong connections between the four, defendants are correct that the plaintiffs fall far short of alleging the lack of formal separation which would be necessary to prevail under their alter ego theory. *Shapiro, Lifschitz & Schram v. R.E. Hazard, Jr.,* 24 F.Supp.2d 66, 70 n. 3 (D.D.C.1998) (an alter ego does not merely control the other entity; the two must have ceased to be separate entities). However, the connections are strong enough to give rise to an inference that all three, Paul Baan, Jan Baan, and Vanenburg, had the power to control Baan.

*See S.E.C. v. Savoy Industries, Inc.,* 587 F.2d 1149, 1170 n. 49 (D.C.Cir.1978) (noting, but not resolving, the "variety of interpretations"); *Arthur Children's Trust v. Keim,* 994 F.2d 1390,1398 (9th Cir.1993) (scienter not required); *Gordon v. Burr,* 506 F.2d 1080 (2d Cir.1974) (knowledge or culpable participation in the fraud is necessary for control person liability). However, as the Court has found that plaintiffs adequately plead the existence of scienter as to each defendant, it is unnecessary to resolve that dispute.

**28.** In fact, a position as CEO may be enough to establish control person status by itself. *See In re Miller Ind.,* 12 F.Supp.2d at 1332; *Food and Allied Service Trades Dep't., AFL–CIO v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994) (status as director insufficient to show control, but court inferred responsibility and control from corporate positions such as CFO and Secretary); *but see Wool,* 818 F.2d at 1441.

For the reasons stated, it is therefore

**ORDERED** that the motions to dismiss for lack of subject matter jurisdiction are granted as to those plaintiffs who neither reside in the United States nor made their stock purchases in the United States; it is

**FURTHER ORDERED** that plaintiffs' Section 10(b) claims pursuant to 15 U.S.C. § 78j(b) against Paul Baan, Vanenburg, Grabe, and Hodgson are dismissed; and it is

**FURTHER ORDERED** that the motions to dismiss plaintiffs' claims for control person liability under 15 U.S.C. § 78t(a) are denied.

IT IS SO ORDERED.