## In re BAAN COMPANY SECURITIES LITIGATION

No. CIV.A.98–2465 ESH.

United States District Court, District of Columbia.

Feb. 20, 2003.

dismissed for this reason as well.

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Josua H. Vinik, Milberg, Weiss, Bershard, Hynes & Lerach, LLP, New York City, for Laure Salerno, Plaintiff.

Leslie Gordon Fagen, Lewis Farberman, Daniel J. Leffell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Tom C. Tinsley.

Joshua H. Vinik, Milberg, Weiss, Bershard, Hynes & Learch, LLP, New York City, for Lead Plaintiffs, Plaintiff.

Lee S. Shalov, Cary L. Talbot, Milberg, Weiss, Bershard & Lerach, LLP, New York City, Ralph M. Stone, Shalov, Stone & Bonner, LLP, New York City, for Plaintiffs' Co–Lead Counsel, Plaintiff.

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, for Plaintiffs Liaison Counsel, Plaintiff.

Leslie Gordon Fagen, Lewis Farberman, Daniel J. Leffell, Paul Weiss, Rifkin, Wharton & Garrison, New York City, for Baan Company, NV, Defendant.

Saul Murray Pilchen, Andrew L. Sandler, Colleen Patricia Mahoney, Stephan Paul Vaughn, Andy Gene Rickman, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for Jan Baan, Defendant.

Leslie Gordon Fagen, Lewis Farberman, Daniel J. Leffell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for NM Klaas Wagenaar, Defendant.

Saul Murray Pilchen, Andrew L. Sandler, Colleen Patricia Mahony, Stephan Paul Vaughn, Andy Gene Rickman, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for JG Paul Baan, Defendant.

Leslie Gordon Fagen, Lewis Farberman, Daniel J. Leffell, Paul Weiss, Rifkind, Wharton & Garrison, New York City, for William O. Grabe, David C. Hodgson, Amal M. Johnson, Defendants.

Robert James Symon, Frank Leone, Jr., Spriggs & Hollingsworth, Washington, DC, William K. Holmes, Melvin G. Moseley, Jr., Warner Norcross & Judd LLP, Grand Rapids, MI, for Vanenberg Ventures, BV, Defendant.

Scott William Muller, David, Polk & Wardwell, Washington, DC, for MCI Communications Corporation, Gerald H. Taylor, Timothy F. Price, Douglas L. Maine, Bert C. Roberts, Jr., David M. Case, Defendants.

## *MEMORANDUM OPINION*

HUVELLE, District Judge.

This is a class action brought on behalf of all persons who purchased or otherwise acquired the securities of Baan Company ("Baan") between January 28, 1997 and October 12, 1998 (the "Class Period").[1] Plaintiffs have alleged that defendants[2]

---

1. The class is limited to those persons or entities that (1) are current residents of the United States; (2) were residents of the United States when they acquired Baan securities; or (3) purchased such securities within the United States. Also excluded are purchasers who obtained Baan securities on a foreign exchange and resided abroad at that time, even if they subsequently moved to the United States.

2. Defendants are Tom C. Tinsley, Baan Company N.V., Jan Baan, N.M. Klass Wagenaar, J.G. Paul Baan, William O. Grabe, David C.

made materially false and misleading statements about Baan's business, finances and future prospects, in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78a (1997), specifically sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. 78t(a).[3] Two defendants, Vanenburg Group, B.V.[4] ("Vanenburg") and J.G. Paul Baan ("Paul Baan"), brought motions to dismiss for lack of personal jurisdiction. In response to these motions, plaintiffs requested discovery limited to the jurisdictional question, which request was granted by Magistrate Judge John M. Facciola. *In re Baan Co. Securities Litigation*, 81 F.Supp.2d 75 (D.D.C.2000).

After discovery had been taken, Magistrate Judge Facciola filed a Report and Recommendation on June 11, 2002, recommending that both defendants' motions to dismiss be granted. This Report has now generated a flurry of paper. Plaintiffs have filed objections; defendants have filed responses to these objections, to which plaintiffs have filed a reply. Moreover, plaintiffs have filed two supplemental briefs in further support of their objections, and defendants have responded to each of these supplements.

These pleadings require the Court to address several basic issues. First, the Court must determine the evidentiary standard that plaintiffs must meet at this stage of the litigation in order to survive defendants' motions to dismiss for lack of personal jurisdiction. Next, applying that standard, the Court must decide whether plaintiffs have adduced sufficient evidence

to establish "general" personal jurisdiction, and specifically whether such jurisdiction can be established on the theory that Paul Baan and Vanenburg are "control persons" of Baan to which Baan's jurisdictional contacts may be imputed. Finally, if general personal jurisdiction does not exist, the Court will have to determine whether plaintiffs have made an adequate showing of "specific" personal jurisdiction, which exists if Vanenburg and Paul Baan engaged in acts directed at the United States and if the fraud alleged in the Complaint arises from or relates to those acts.

After a careful review of the parties' submissions and the voluminous record amassed in this case, the Court concludes that despite the Magistrate Judge's Report and Recommendation, defendants' motions to dismiss must be denied. While plaintiffs have not demonstrated that general personal jurisdiction is appropriate, they have presented sufficient evidence that defendants were aware of and participated in the fraudulent scheme which is at the heart of this case, and therefore, the Court may assert specific personal jurisdiction over Vanenburg and Paul Baan in a matter consistent with the Fifth Amendment of the U.S. Constitution.

**BACKGROUND**

The background to this complex and long-running litigation has been set out in previous opinions and need not be exhaustively restated here. The Court instead concentrates on the points salient to the instant motions to dismiss. Baan is a

---

Hodgson, Amal M. Johnson, and Vanenburg Ventures, B.V.

**3.** The § 10(b) claims against both defendants involved in this motion were dismissed at an earlier stage of this litigation, leaving only plaintiffs' § 20(a) claims. *See In re Baan Company Securities Litigation*, 103 F.Supp.2d 1 (D.D.C.2000).

**4.** Vanenburg Group, B.V. was known as Baan Investment B.V. until July 1998. (Compl.¶ 23.). For simplicity, the Court will use the term "Vanenburg" to describe the company, regardless of the date of the events being discussed.

NASDAQ-listed company with offices in the Netherlands and Reston, Virginia. (Second Am. Compl. ["Compl."] ¶¶ 14, 19.) Paul Baan served as chairman of Baan's board of supervisory directors from April 1996 to December 1997. Plaintiffs allege that Baan inflated its reported revenue and earnings by selling software licenses (or "seats") to its affiliates on a consignment basis, whereby Baan agreed to buy back the products if the affiliates were unable to resell them to end-users. (Compl.¶ 7.) The parties refer to these transactions as "indirect channel" sales. According to the Complaint, Baan violated Generally Accepted Accounting Procedures ("GAAP") and SEC regulations by recognizing these non-final sales as revenue on its balance sheet, and incorporated these misleading revenue figures into its public statements and official filings. Specifically, these misstatements found their way into Baan's formal SEC filings (including the company's annual 20–F and quarterly 6–K forms), as well as press releases, claims made on Baan's website, and news articles, which often included quotes from Baan's officers. *See Baan,* 103 F.Supp.2d at 5–6. Plaintiffs allege that Baan relied on these false statements to satisfy investor and shareholder EPS ("earnings per share") expectations, and thereby to maintain its stock price at artificially high levels. In addition to deceiving investors, these elevated share prices allowed Baan affiliates to use their Baan stock to secure loans that allowed them to keep participating in the consignment sales, creating a positive feedback loop of deception.

The instant motions to dismiss have been filed by Vanenburg and Paul Baan. Vanenburg is a privately held Dutch company controlled by Paul Baan and his brother Jan. (*See* Baan's Annual Report to SEC for FY 1997 ("1997 Form 20–F") at 53.) The company is "established under the laws of the Netherlands and is registered to do business only in the Netherlands." (Dep. of J.G. Paul Bann ("Baan Dep.") at 25). It has no offices, places of business, employees, registered agents, telephone listings, or mailing addresses in the United States (Aff. of Herman Frijling ("Frijling Aff.") ¶¶ 3–6), and its Board of Supervisory Directors and Board of Managing Directors have not met in the United States. (Aff. of Paul Baan, July 23, 1999 ("Baan Aff. 7/23/99") at ¶ 7). Paul Baan has been president and managing director of Vanenburg since 1994. Throughout the Class Period, Vanenburg controlled a large block of Baan stock, ranging from 39 to 43 percent, though in November 1998 these holding were reduced to 30 percent. *Baan,* 103 F.Supp.2d at 5.

In addition to this ownership relationship, Vanenburg and Baan had close business ties. In December 1997 Vanenburg and Baan worked together to form a new affiliate: Baan Midmarket Solutions ("BMS"). Eighty-five percent of this new company was owned by Vanenburg, with Baan owning the remaining 15 percent. *See id.* Plaintiffs also allege that pursuant to another agreement Baan charged BMS for a variety of expenses (including overhead, salaries, and benefits) associated with operating the affiliate, but that this agreement was actually negotiated not by BMS but by Vanenburg and that Vanenburg paid these expenses itself. (Pls.' Second Supp. Br. at 4–5.) Moreover, the "Software Distribution Agreement" that created BMS and allowed the new entity to act as a non-exclusive distributor of Baan products was signed by Paul Baan on behalf of Vanenburg. (Decl. of Jill M. Levy, Nov. 20, 2002 ["Levy Decl. 11/29/02"], Ex. 5.) Plaintiffs contend that throughout the remainder of the Class Period, BMS became a primary vehicle through which Baan arranged its consignment sales.

In their motions, filed under Fed. R. Civ. P. 12(b)(2), Vanenburg and Paul Baan argue that exercising personal jurisdiction over them would violate the Due Process Clause of the Fifth Amendment. They assert that neither defendant has sufficient contacts with the United States to make it foreseeable that they would be haled into court in this country. Plaintiffs respond that personal jurisdiction properly exists over these defendants on two basic theories: (1) because these defendants are "control persons" of Baan, which indisputably has adequate jurisdictional contacts with the United States; and (2) because of Vanenburg's and Paul Baan's own contacts with the United States in connection with the alleged fraud that has given rise to this litigation.

As to the first theory, plaintiffs assert that personal jurisdiction exists over Vanenburg because it owns such a significant portion of Baan's outstanding common shares that it is appropriate to subject Vanenburg to the same liability and jurisdiction as Baan. Plaintiffs allege that Vanenburg was intimately related to Baan, a relationship evidenced by the fact that it acted in partnership with Baan by, for example, forming BMS through which nearly all of the supposedly fraudulent "indirect channel sales" occurred. (Compl. ¶¶ 23, 38, 78.) Moreover, Vanenburg's subsidiary, The Baan Institute, used Baan's logo (Talbot Decl. Ex. 10), and

press reports noted the difficulty of distinguishing between Vanenburg and Baan, especially, though not exclusively, when the former was still known as Baan Investments. (*Id.* ¶ 3). Further, Vanenburg's own financial statements stated that "Vanenburg Group's operations were closely related to those of Baan Company in 1997." (Defs.' Renewed Mot., Tab E, Ex. B at 20.) As such, plaintiffs suggest that Vanenburg and Baan are so related that the latter's undisputed jurisdictional contacts with the United States may properly be imputed the former.[5]

Plaintiffs assert that jurisdiction exists over Paul Baan, a Dutch citizen without residence or property in the United States (Paul Baan Aff. 7/23/99, at ¶¶ 1–2), on a similar control person theory. Paul Baan was the sole Managing Director of Vanenburg at all times during the Class Period. (Paul Baan Aff. 7/23/99 at ¶ 3.) Though he claimed that his responsibilities in this position were limited (Paul Baan Dep. at 17), he did testify that he was responsible for certain "high level management activities." (Paul Baan Dep. at 18.) Moreover, plaintiffs point to other evidence that they say casts doubt on Paul Baan's testimony that he had little involvement in the day-to-day operations of Baan. Plaintiffs thus cite a May 19, 1995 Prospectus issued in connection with Baan's IPO to allege that Paul Baan effectively controlled Baan, through Vanenburg, from that time forward:

Jan Baan and J.G. Paul Baan, by virtue of their positions as managing directors

---

5. Plaintiffs further assert that Vanenburg has other general business contacts with the United States, in that the company owns approximately twenty affiliates that have property, maintain offices and payrolls, and conduct business in the United States, and from which it earned revenue during the Class Period. (Decl. of Jill M. Levy, May 2, 2002 ["Levy Decl. 5/2/02"], Ex. 8; Aff. of Paul Baan, 11/11/99 ["Paul Baan Aff. Nov. 1999"] ¶ 3; Talbot Decl. Ex. 20.) Relying on newspaper articles, plaintiffs also allege that Vanenburg

directed the purchase and development of the Virginia Tract, a plot of land on which Baan's new U.S. headquarters was to be established. (Talbot Decl., Exs. 3–9.) Finally, they claim that jurisdiction is appropriate because Vanenburg had a controlling interest in Baan when Baan made an initial public offering of its shares, most of which were offered in the United States and traded on the NASDAQ. (Defs.' Renewed Mot. to Dismiss, Tab F: May 19, 1995 Prospectus at 1, 10.)

of [Vanenburg] and the control they exercise over the entities that own and control the shares of the shares of [Vanenburg], effectively have the power to vote the Common Shares of the Company owned by [Vanenburg]. Messrs. Baan and Baan will therefore also have the effective power to influence significantly the outcome of matters submitted for shareholder action, including the appointment of members of the Company's Management and Supervisory Boards and the approval of significant change in control transactions, and may be deemed to have control over the management and affairs of the Company.

(Defs.' Renewed Mot. to Dismiss, Tab F: May 19, 1995 Prospectus at 10).[6]

As to specific jurisdiction, plaintiffs argue that Vanenburg and Paul Baan were directly involved in the activity that forms the basis for this suit. To this end, they point to Vanenburg's control over BMS, the vehicle for many of the consignment sales that Baan allegedly used to artificially inflate its revenue figures and its stock price. Plaintiffs also suggest that both Vanenburg and Paul Baan were informed of Baan's dubious accounting and financial reporting practices during the Class Period. For example, Baan's Supervisory Board received a copy of Moret Ernst & Young's ("MEY") 1997 Management Letter warning that there was a risk that Baan was "inappropriately recognizing

revenue before all of the relevant revenue recognition criteria are actually met." (Levy Decl. 5/2/02, Ex. 2 at 5.) Moreover, Paul Baan participated in a "Collective Management and Supervisory Board Meeting" at which issues such as Baan's relationship with Vanenburg were discussed. (Levy Decl. 5/2/02, Ex. 10 at 7138.) He was also present for at least one Supervisory Board meeting that was called to review and ratify transactions involving Baan and Vanenburg, including the joint venture agreement that created BMS.[7] (Levy Decl. 5/2/02, Ex. 4 at 6959–63.) The Supervisory Board was also responsible for "the appointment of members of [Baan's] Management Board and the senior officers of the Company," as well as for approving the issuance of shares (including those issued in the United States), and proposed mergers. (Levy Decl. 5/2/02, Ex. 5.) Based on these contacts, plaintiffs assert that Vanenburg and Paul Baan both knew of and were implicated in the allegedly fraudulent accounting practices that lie at the heart of this case, and therefore that it is constitutionally appropriate for the Court to exercise personal jurisdiction over these defendants.

## ANALYSIS

### I. Evidentiary Standard for a Post–Discovery Motion to Dismiss

■ The first issue that the Court must address is the evidentiary standard by

---

**6.** Plaintiffs also assert that personal jurisdiction exists over Paul Baan because of the contacts he had with the United States while transacting business for Vanenburg, which purchased a number of shares of several U.S. corporations. (Levy Decl. 5/2/02, Ex. 8.) In his deposition, Paul Baan acknowledged that he made four business trips to the United States "for the purpose of meeting with companies that were affiliates or attractive acquisition prospects" for Vanenburg. (Paul Baan Dep. at 73–77.) He also traveled to the United States once for a Baan Supervisory Board Meeting. (*Id.* at 101–02.) All together, Paul

Baan testified that he spent less than fifteen days in the United States during the class period. (*Id.* at 73–77.) Paul Baan also testified that while he did make calls to the U.S. counsel for Vanenburg, he did not do so often (*id.* at 67), and that he only infrequently communicated with people representing Vanenburg's U.S. acquisitions (*id.* at 77–79.)

**7.** Paul Baan affirmatively withheld his vote at this meeting. (Levy Decl. 5/2/02, Ex. 4 at 6962–63.)

which a plaintiff who has been afforded an opportunity to conduct jurisdictional discovery is to establish personal jurisdiction. The D.C. Circuit has not answered this precise question. The Court of Appeals has held that plaintiffs "have the burden of proving personal jurisdiction, and can satisfy that burden with a *prima facie* showing, unless the trial court holds an evidentiary hearing." *Edmond v. U.S. Postal Service General Counsel,* 949 F.2d 415, 424 (D.C.Cir.1991) (internal citation omitted). In *Edmond,* however, the plaintiff had not yet conducted discovery as to jurisdiction, and thus that case does not provide clear guidance as to what standard should be applied once such discovery has occurred.

The parties disagree about this issue. Plaintiffs contend that the Magistrate Judge's Report and Recommendation erred in refusing to allow them to rely on the allegations contained in their Complaint to establish personal jurisdiction and in concluding that only evidence admissible under the Federal Rules of Evidence could be used to make the necessary showing. (Pls.' Obj. 4–8.) Defendants counter that now that discovery has been taken, plaintiffs are required to go beyond the pleadings and to adduce actual evidence sufficient to defeat a Rule 12(b)(2) motion. A review of the case law, however, reveals a general agreement as to the standard appropriate to this procedural posture, which does not precisely correspond to either party's position.

For example, the Second Circuit has held that before discovery, "a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). However, where discovery has occurred,

but no evidentiary hearing has been held, "the plaintiff's prima facie showing ... must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 567 (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990)). In other words, the *prima facie* showing must be "factually supported," but the factual statements put forward by the plaintiff are to be credited as true for purposes of deciding the motion to dismiss. *Ball,* 902 F.2d at 197 ("[T]he plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."); *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) ("[S]ince the district court did not hold a hearing or a trial on the merits, all pleadings and affidavits must be construed in the light most favorable to [plaintiff] and all doubts must be resolved in [plaintiff's] favor.").[8]

The First Circuit has adopted a similar approach. In post-discovery cases in which no evidentiary hearing has been held, the court generally uses the conventional *prima facie* standard, which requires the court to "accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir.1995). However, to make this showing, "the plaintiff cannot rest upon mere averments, but must adduce competent evidence of specific facts." *Barrett v. Lombardi,* 239 F.3d 23, 26–27 (1st Cir. 2001). For purposes of the 12(b)(2) motion, the facts adduced by the plaintiff are accepted as true (regardless of whether

---

**8.** This is because by making a 12(b)(2) motion, the defendant accepts the truth of plaintiffs' factual allegations for purposes of the motion, and challenges only their legal sufficiency. *See Musso v. Seiders,* 194 F.R.D. 43, 48 (D.Conn.1999).

they are contested) and construed in the light most favorable to a finding of personal jurisdiction. In addition, any uncontroverted facts put forward by defendant are also considered in determining whether such jurisdiction exists. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir.2002); *Massachusetts School of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir.1998).

These cases thus indicate that at this stage, plaintiffs must produce evidence to support their assertions, but also that, if plaintiffs do so, the Court must credit those assertions as true. This "factually documented" prima facie standard obliges plaintiffs to support their bare allegations, but instructs a court to look favorably upon those assertions once the required proffer is made. *Cf. AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir.1996) (in ruling on 12(b)(2) motion, "uncontroverted allegations in [plaintiff's] complaint must be taken as true, and 'conflicts between the facts contained in the parties affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists'").

Therefore, in order to defeat defendants' 12(b)(2) motion, plaintiffs here must make a factual showing that supports their jurisdictional allegations. Conclusory statements are inadequate; plaintiffs must instead "allege specific acts connecting defendant with the forum," *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787–88 (D.C.Cir.1983) (quoting *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 n. 5 (9th Cir.1980)), and must back up those allegations with concrete evidence. *See First Chicago Int'l. v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1378 (D.C.Cir. 1988). Such evidence may include "affidavits and discovery materials," which the Court will accept as true and construe in plaintiffs' favor. Finally, while defendants' evidence is relevant, any conflicts between the parties' versions of the evidence are to be resolved in plaintiffs' favor. *See* 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.6 (3d ed.2002) (where "both the plaintiff and the defendant produce supporting evidence and affidavits on the motion, a number of cases hold that the plaintiff's prima facie showing will be considered sufficient and the motion to dismiss will be denied, notwithstanding the defendant's presentation of contrary material").[9]

9. The Court must address one further preliminary matter. In the Report, Magistrate Judge Facciola did not credit certain Vanenburg documents that plaintiffs tried to use to impeach Paul Baan's testimony that he did not know about Baan's accounting practices. Instead, the Magistrate Judge determined that, because Paul Baan "was never confronted with the documents, there was no evidentiary foundation for the assertion that he knew what was in them." (Report at 7 n. 2.) This is consistent with the Magistrate Judge's determination that "plaintiff must establish personal jurisdiction by admissible evidence." (Report at 2). The Court, however, does not share this strict view of what evidence may be considered at this stage of the case.

The only case cited in favor of this exclusionary rule states merely that the plaintiff "must adduce competent evidence of specific facts," not that the evidence must be specifically admissible. *Barrett*, 239 F.3d at 26. Certainly if the Court had held an evidentiary hearing on the jurisdictional issues, the parties would be required to submit admissible evidence. Nevertheless, while the law is clear that the plaintiffs must produce some evidence to support their assertions, it does not follow that this evidence must be ignored if it does not strictly comport with the Federal Rules. Plaintiffs have cited no case—not even *Barrett*—that so holds. Moreover, Paul Baan signed at least one of the Vanenburg documents, which seems to alleviate the foundation problems identified in the Report. (Levy

## II. General Personal Jurisdiction

Section 27 of the Securities Exchange Act provides that a defendant sued under the statute may be served with process "wherever the defendant may be found." 15 U.S.C. § 78aa. In conjunction with Rule 4(k)(2) of the Federal Rules of Civil Procedure, such service is sufficient to confer personal jurisdiction.[10] *Cf. Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir. 1972) (stating that although Section 27 "does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States"). This does not end the inquiry, however, as the Court's assertion of personal jurisdiction must, as always, comport with the requirements of the Constitution. *GTE New Media,* 199 F.3d at 1347 (even when statutory requirements are met, "a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause"). In this respect, the Court must consider whether Paul Baan and Vanenburg have the requi-

site "minimum contacts" with the judicial forum (here, the United States)[11] such that assuming jurisdiction over them satisfies the core demand of due process: that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Supreme Court has recognized that when a defendant is not physically present in a forum, the Due Process Clause can nevertheless support the assertion of personal jurisdiction on at least two different grounds. The difference turns on whether the defendant's contacts with the forum are the basis for plaintiff's suit. If they are not, the rules of "general" personal jurisdiction apply, which allows a foreign defendant to be sued only if it maintains "continuous and systematic general business contacts" with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996). In contrast, "specific" personal jurisdiction exists if defen-

Decl. 5/2/02, Ex. 4.) Finally, defendants have raised no admissibility objections to the documentary evidence considered by the Court in this Memorandum Opinion. In the absence of such an objection, there is certainly no reason for the Court to ignore this evidence.

**10.** In a recent case, Judge Paul Friedman determined that the Securities Act's broad service-of-process provision applies *only* when Section 27's venue provision is also satisfied. *See Poling v. Farrah,* 131 F.Supp.2d 191, 192–93 (D.D.C.2001). The latter provision creates venue in any judicial district wherein "any act or transaction constituting the violation occurred" or in any district where the defendant "is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa. In other words, the statute allows process to be served and personal jurisdiction to be asserted only when a court actually has venue over the case. *Cf. GTE New Media*

*Services Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1350–51 (D.C.Cir.2000) (construing Clayton Act's similar venue/service-of-process provision). Here, defendants have not argued that venue in this Court is inappropriate; for that reason, and because Paul Baan and Vanenburg have been served in accordance with Section 27, the statute undoubtedly confers personal jurisdiction over these defendants. *See Poling,* 131 F.Supp.2d at 194.

**11.** In this case, in light of the Securities Act's nationwide service-of-process provision, the "forum" for personal jurisdiction purposes is the United States as a whole, rather than the District of Columbia. *See SEC v. Carrillo,* 115 F.3d 1540, 1543–44 (11th Cir.1997); *Trust Co. of La. v. N.N.P., Inc.,* 104 F.3d 1478, 1486–87 (5th Cir.1997); *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993).

dants have "purposefully directed [their] activities at residents of the forum" and "the litigation results from alleged injuries that 'arise out of or relate to those activities.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In this case, plaintiffs assert that jurisdiction can be maintained under either theory.

With respect to general jurisdiction, plaintiffs' primary argument is that both Paul Baan and Vanenburg are "control persons" of Baan, which indisputably has continuous and systematic business contacts with the United States. Under this theory, Baan's jurisdictional contacts may be imputed to Paul Baan and Vanenburg, thus allowing the Court to assume personal jurisdiction over those two defendants as well. (Pls.' Mem. in Opp. to Vanenburg and Paul Baan's Renewed Mot. to Dismiss at 26–29; Pls.' Objections at 10–11.) In response, defendants first contend that Magistrate Judge Facciola's opinion determining the extent of the discovery that plaintiffs could engage in sets out the law of the case. There, the Magistrate Judge considered the control personal theory of jurisdiction at length, ultimately rejecting it as being overbroad and inconsistent with

prevailing case law. *See In re Baan Co. Securities Litigation*, 81 F.Supp.2d 75, 79–83 (D.D.C.2000). Plaintiffs counter that these statements are mere dicta, and thus not binding as the law of the case. There is no need to resolve this issue, because the Court agrees with the substance of Magistrate Judge Facciola's comments regarding plaintiffs' theory (however those comments are categorized), and now holds that this approach cannot support the assertion of general personal jurisdiction in this case.[12]

The notion of a control person derives from § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which attaches liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." By regulation, the term "control" has been defined to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities,

---

**12.** In addition, as described above, plaintiffs claim that Paul Baan and Vanenburg have the requisite contacts by virtue of Paul Baan's purchase of the Virginia Tract, the plot of land that was expected to serve as Baan's U.S. headquarters. (Pls.' Mem. in Opp. to Vanenburg and Paul Baan's Renewed Mot. to Dismiss at 25.) This argument fails. In the first place, plaintiffs have adduced no actual evidence that Paul Baan or Vanenburg was directly involved in the purchase, or that they ever occupied or owned the land. Indeed, plaintiffs' motion relies solely on news reports, which indicate that Baan was responsible for the purchase. (Talbot Dec., Exs. 3–9.) This is seemingly confirmed by the Warranty Deed exhibited by defendants, which purports to show that a company called "Baan Real Estate" bought the property. (Paul Baan Aff., 11/11/1999, ¶ 12.) Plaintiffs have put forward

nothing beyond mere assertions to contradict this evidence or to connect Paul Baan in his personal capacity or Vanenburg to the land deal. While Baan Real Estate may have been an affiliate of Vanenburg (Paul Baan Dep. at 69–70), this fact, as explained below, does not allow the former's contacts to be imputed to the latter.

Moreover, even if plaintiffs could establish that Paul Baan or Vanenburg did direct the purchase, that transaction, standing alone, would not be sufficiently continuous or systematic to support the exercise of general jurisdiction over those defendants. And there is no indication that plaintiffs' cause of action in any way arises from, or even relates to, this purchase. As such, the allegation concerns the Virginia Tract are insufficient to support a finding of personal jurisdiction.

by contract, or otherwise." 17 C.F.R. § 230.405(f).

There is a division of authority as to whether a showing that an entity is a controlling person within the meaning of these provisions (and thereby potentially liable under the securities law to the same extent as the controlled entity) is automatically sufficient to bring that party within the personal jurisdiction of the court merely because the controlled entity itself has the requisite jurisdictional contacts. Plaintiffs' theory is supported most prominently by *San Mateo County Transit Dist. v. Dearman, Fitzgerald, & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir.1992), in which the Ninth Circuit held that jurisdiction is appropriate if the plaintiff makes only "a non-frivolous allegation that the defendant controlled a person liable for the fraud." The Ninth Circuit reasoned that if a suit is to "enforce a liability created by the Securities Act, the court has jurisdiction of the defendant wherever he may be found." *Id.* Thus, under this approach, there is no need to show that the control person culpably participated in the actual acts alleged to be fraudulent. *See also*

*McNamara v. Bre–X Minerals Ltd.*, 46 F.Supp.2d 628, 636–37 (E.D.Tex.1999) ("[T]he Court has personal jurisdiction over any Defendant as to which the Plaintiffs make a *prima facie* showing of control person liability.").[13]

Following this line of cases would support a finding of personal jurisdiction, especially in light of Judge Green's previous holding in this case that plaintiffs have put forward sufficient allegations that Vanenburg and Paul Baan were control persons with the ability to direct Baan's activities.[14] Plaintiffs now have provided factual support for all of these allegations. In discovery, defendants produced documents stating that Jan and Paul Baan at one point were "deemed to have control over the management and affairs of the Company" (Defs.' Renewed Motion, Tab F: May 1995 Prospectus at 10), and that "Vanenburg Group's operations were closely related to those of Baan Company in 1997." (Vanenburg's Renewed Motion to Dismiss, Tab E, Ex. B at 20.) As such, if the theory outlined in the cases cited above is correct, it would follow that the Court could as-

---

**13.** It should be noted that Judge Joyce Green, in a previous opinion filed in this case, agreed with plaintiffs that they need not show participation in the actual wrongful act alleged to show that defendants were control persons, for purposes of establishing *subject matter* jurisdiction. *See Baan*, 103 F.Supp.2d at 23–24. The Court noted that while "[s]ome courts have required plaintiffs to show that the defendants 'culpably participated' in the underlying fraud," the "language of the statute suggests that once plaintiffs have established the defendants' ability to control, it becomes the defendants' burden to show that they did not participate in the fraud, and that they acted in good faith." *Id.* at 23 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)). Holding otherwise, the Court suggested, "would erode the distinction between direct liability under 10(b) and control person liability under 20(a)." *Id.* This, of course, *is* the law of the case.

**14.** In her June 2000 Opinion, Judge Green concluded that, accepting plaintiffs' allegations as true, they had pled adequate facts to give rise to an inference that Paul Baan and Vanenburg had the power to control Baan. To this end, Judge Green relied on plaintiffs' allegations that (1) Paul Baan was a member of Baan's board of supervisory directors; (2) Paul Baan had previously served as Baan's COO, and was vice chairman, managing director, and president of Baan until he resigned in April 1996; (3) Vanenburg is controlled by Paul and Jan Baan, and owns a large percentage of Baan's stock; (4) Vanenburg and its subsidiaries are Baan's business partners; and (5) Baan and Vanenburg jointly own a group of subsidiaries. *See Baan*, 103 F.Supp.2d at 24 (holding that "the connections are strong enough to give rise to an inference that ... Paul Baan, Jan Baan, and Vanenburg, had the power to control Baan").

sume personal jurisdiction over Paul Baan and Vanenburg.

In his Report, however, Magistrate Judge Facciola rejected these cases. He sided instead with another line of authority, which insists on a separation between control person liability and personal jurisdiction. In these cases, mere control over a local corporation has been deemed insufficient to establish personal jurisdiction. *See Tracinda Corp. v. Daimlerchrysler AG,* 197 F.Supp.2d 86, 99 (D.Del.2002); *FDIC v. Milken,* 781 F.Supp. 226, 234 (S.D.N.Y.1991) (holding that the question of control person liability was "not germane to the issue of personal jurisdiction"); *cf. Little Switzerland, Inc. v. Destination Retail Holdings Corp.,* 1999 WL 223496, at * 10 (D.Del. Mar. 31, 1999) (finding "no evidence that plaintiff's 'controlling person' theory has found acceptance in Delaware as an alternate basis for asserting personal jurisdiction over a nonresident").

■ The Court agrees that the broad understanding of control person liability adopted by the Securities Act cannot on its own support personal jurisdiction. This approach impermissibly conflates statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair. Congress' decision to make a broad group of persons liable under the securities laws cannot on its own discharge the responsibility of the federal courts to ensure that such persons have sufficient connection to the United States to render jurisdiction over them

compatible with the Due Process Clause. The Fifth Amendment is made of sterner stuff.[15] Moreover, imputing the jurisdictional contacts of a controlled entity to the control person runs afoul of the general rule that "a defendant corporation's contacts with a forum may not be attributed to shareholders, affiliated corporations, or other parties." *Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 90 F.Supp.2d 15, 22 (D.D.C.2000); *see also Network Enters., Inc. v. APBA Offshore Prods., Inc.,* 2002 WL 31050846, at * 2 (S.D.N.Y. Sept. 12, 2002). In support of this principle, courts in this jurisdiction and elsewhere have long held that only in "special circumstances" can jurisdiction be asserted over an out-of-forum parent corporation based on the forum contacts of its subsidiary. *Pathe Computer Control Systems Corp. v. Kinmont Indus., Inc.,* 955 F.2d 94, 96 (1st Cir.1992) (Breyer, J.); *accord El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C.Cir.1996); *Escude Cruz v. Ortho Pharm. Corp.,* 619 F.2d 902, 905 (1st Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary."); *Milken,* 781 F.Supp. at 230 ("[Plaintiffs] cannot base their claim for jurisdiction over the person merely on the defendants' parentage of a corporation in this forum.").

■ In light of these principles, it simply goes too far to hold, as the Ninth Circuit did in *San Mateo,* that mere control status is sufficient to create personal jurisdiction.[16] If jurisdiction exists simply

---

**15.** Analogously, the Ninth Circuit noted in a CERCLA case that "liability is not to be conflated with amenability to suit in a particular forum. Personal jurisdiction has constitutional dimensions, and regardless of policy goals, Congress cannot override the due process clause, the source of protection for nonresident defendants." *AT & T v. Compagnie*

*Bruxelles Lambert,* 94 F.3d 586, 590–591 (9th Cir.1996).

**16.** While the Court disagrees with the Ninth Circuit's holding in *San Mateo* that the standard for personal jurisdiction is identical to the standard for control person liability, that case can be distinguished as it involved a

because a foreign defendant with no other connection to this country owns a controlling interest in a company that performed an act in the United States or has sufficient contacts with the United States, the difference between parents and subsidiaries that has long existed in the law of personal jurisdiction is obliterated.[17] Thus, the Court concludes that general personal jurisdiction is available only insofar as there is some special feature of the relationship between Paul Baan/Vanenburg and Baan that makes it proper to impute the latter's jurisdictional contacts to the former.[18]

domestic corporation, not a foreign one. The Supreme Court has cautioned that in light of potential international repercussions, American courts should exercise extra caution in asserting personal jurisdiction over foreign defendants. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 115–16, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Thus, even if the Court found *San Mateo's* analysis persuasive, it would not necessarily follow that the same approach would apply to foreign defendants such as Paul Baan and Vanenburg.

**17.** As Magistrate Judge Facciola wrote: "In a world that is shrinking as a result of the communications revolution, and with the rapid emergence of a global, economic culture, acceptance of plaintiff's theory would mean that an individual in Guam who used the Internet to purchase 10 shares of stock of a company in the Netherlands could cause a person who has never been in the United States to appear and defend itself in the United States District Court for the District of Guam merely by alleging that he controlled the Netherlands corporation which issued the stock. The staggering implications of the acceptance of that theory makes it understandable that the cases, including the ones upon which plaintiffs try to rely, have never gone that far. To the contrary, each (with one exception) has required more than the allegation that defendant controlled the entity which performed the act claimed to have violated the pertinent securities law before asserting jurisdiction over its person." *Baan*, 81 F.Supp.2d at 79–80.

**18.** A related line of cases seems to support a weaker version of plaintiffs' control person theory. Under these cases, a court may assume personal jurisdiction over a control person where the plaintiff can show that defendant knew, or was in a position to know, about the allegedly fraudulent practices that give rise to the action. In *Derensis v. Coopers & Lybrand Chartered Accountants*, 930

F.Supp. 1003 (D.N.J.1996), for example, personal jurisdiction was exercised over defendants who had no direct contacts with the United States, after plaintiffs made a *prima facie* showing that defendants were "controlling persons" who allegedly approved and disseminated financial statements that they knew would influence the price of securities on the NASDAQ market. Similarly, in *Landry v. Price Waterhouse Chartered Accountants*, 715 F.Supp. 98, 102 (S.D.N.Y.1989), the court held that a Canadian third-party defendant was subject to personal jurisdiction where the third-party plaintiff had made a *prima facie* showing that the defendant was a "controlling person" and the defendant knew—or should have known—of the controlled company's allegedly misleading financial statements, which artificially inflated the price of the company's stock.

In these cases, control person liability gives rise to personal jurisdiction because it creates the inference that defendant's relationship to the controlled party renders it least *constructively* aware of that party's allegedly unlawful conduct in the forum. However, in the absence of actual culpable participation in the alleged fraud—which in the present case at least is not a necessary element of plaintiffs' substantive claim, *see supra* n. 12—this understanding of personal jurisdiction is too broad. This approach (based merely on what a defendant was in a position to know) is essentially indistinguishable from the Ninth Circuit's conflation of substantive liability and personal jurisdiction. In contrast, however, if personal jurisdiction *is* backed by a supported allegation of culpable participation, as in *Derensis*, what we have is actually a form of *specific* jurisdiction, as the defendant's contacts (its knowledge of and control over the allegedly unlawful conduct) would themselves give rise to the plaintiff's action. The Court agrees that this is a permissible basis for personal jurisdiction, and takes up below the question of whether plaintiffs here can support their assertions that Paul Baan and Vanenburg ac-

The most prominent special circumstance occurs when the corporation and the out-of-forum party are actually "alter egos." It is well-accepted that where an affiliated party (be it individual or corporate) is an alter ego of a corporation over which the court has personal jurisdiction, "the corporation's contacts may be attributed to the affiliated party for jurisdictional purposes." *Hazard*, 90 F.Supp.2d at 22. In these circumstances, it is appropriate to treat the corporation and its foreign affiliates as a single entity. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n. 18 (5th Cir.2002) ("The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis."); *Home–Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020–21 (10th Cir.1990) ("In such situations, attribution of contacts to the individual defendant merely reflects the reality that, although the contacts were ostensibly those of the corporation, the true actor was the individual. The same situation obtains in those cases holding a corporate parent to answer for conduct within the forum carried out by an alter ego subsidiary.").

To succeed on this theory, plaintiffs would have to show that the companies "are not really separate entities ... or that one acts as an agent of the other." *El–Fadl*, 75 F.3d at 676 (holding that plaintiff failed to show jurisdiction over foreign defendant when it showed only that defendant owned the majority of shares in the local corporation and that the two corporations worked together on certain transactions). The relationship, then, must be closer than one of control; it must be formal domination such that the separateness of the entities is but a "pure fiction." *Richard v. Bell Atlantic Corp.*, 946 F.Supp. 54, 69 (D.D.C.1996) (quoting *Cannon Mfg. Co. v. Cudahy Packing*, 267 U.S. 333, 337, 45 S.Ct. 250, 69 L.Ed. 634 (1925)).

Plaintiffs here cannot rely on the alter ego theory, however, for one simple reason. In Judge Green's June 2000 opinion, which constitutes the law of the case, she found that despite the strong connection between Paul and Jan Baan, Vanenburg, and Baan (which sufficed to establish that the former three were control persons of the fourth), "defendants are correct that the plaintiffs fall far short of alleging the lack of formal separation which would be necessary to prevail under their alter ego theory." *Baan*, 103 F.Supp.2d at 24. This Court has no basis or power to revisit this conclusion. As such, plaintiffs are precluded from imputing Baan's jurisdictional contacts with the United States to Vanenburg and Paul Baan, and cannot defeat defendants' 12(b)(2) motion on this basis.[19]

---

tually knew of or were involved in Baan's allegedly illegal scheme.

**19.** Finally, the general contacts described in footnote 6, *supra*, between Paul Baan and the United States are also insufficient to establish personal jurisdiction. Paul Baan's limited and sporadic forays into this country in order to do business on behalf of Vanenburg do not represent the kind of "continuous and systematic" connection with the United States that the law requires. *See, e.g., Helicopteros*, 466 U.S. at 416–17, 104 S.Ct. 1868 (fact that defendant corporation's employees made several business trips to the forum did not amount to continuous and systematic contracts); *Landoil*, 918 F.2d at 1045–46 (thirteen short business trips to New York over 18 months not "continuous and systematic"); *Bonacci v. Marks*, 1993 WL 366978, at *6 (D.N.J.1993) (two short trips in four years and nine in six years, along with an unspecified number of phone calls, not continuous and systematic).

### III. Specific Personal Jurisdiction

Having rejected the control person theory and found no other grounds for asserting general personal jurisdiction over Paul Baan and Vanenburg, the Court must now address whether specific acts taken by those defendants were both purposefully directed at the United States and related to the events giving rise to plaintiffs' suit. Due process allows a court to assert jurisdiction over a defendant who has purposefully availed itself "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Creighton Ltd. v. Gov't of State of Qatar,* 181 F.3d 118, 127 (D.C.Cir. 1999) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). When defendant does so, his connection with the forum is such that "he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also* Restatement (Second) of Conflict of Laws, § 50 ("A state has power to exercise judicial jurisdiction over a foreign corporation which causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of these effects and of the corporation's relationship to the state makes the exercise of such jurisdiction unreasonable.").

Here, plaintiffs allege that Paul Baan and Vanenburg have caused such consequences in the United States through their involvement with the consignment sales. Plaintiffs assert that Vanenburg used its subsidiaries (in particular BMS) to purchase software from Baan, and that Baan in turn relied on these sales to boost its earnings figures in order to inflate the company's stock price. These fraudulent accounting practices, which undoubtedly had effects in the United States, are of course the basis for plaintiffs' suit. As for Paul Baan, plaintiffs assert that, as a member of Baan's supervisory board, he knew about and approved the accounting practices at issue, and therefore that his actions (and inactions) are directly linked to the harms allegedly suffered by United States investors. As described in footnote 18, *supra,* in light of Vanenburg and Paul Baan's control relationship over Baan, personal jurisdiction can be established if plaintiffs have credibly alleged that these defendants knew about and thus culpably participated in the fraudulent activity. *Cf. Derensis,* 930 F.Supp. at 1014.

The Court turns first to plaintiffs' allegations regarding Vanenburg. Plaintiffs have asserted that Vanenburg has subjected itself to personal jurisdiction by virtue of its involvement with Baan in the indirect channel sales, specifically the loop in which the Vanenburg-dominated BMS was an integral component. In brief, plaintiffs have alleged that this arrangement worked as follows: In late 1997, Baan and Vanenburg created BMS to function as Baan's indirect channel master. (Levy Decl. 11/29/02, Ex. 5.) Baan then sold software licenses to BMS through these channels, which Baan reported as revenue even when BMS was unable to resell the licenses to end-users. In this deceptive way, Baan was able to meet its revenue and EPS expectations. (Levy Decl., Ex. 1 [Dep. of Tom Tinsley] at 284.) This deal was sweetened in an addendum to the original agreement that created BMS; on June 30, 1998, Vanenburg (on behalf of BMS) agreed to retroactively raise the per-unit price of the seats being sold to BMS, thereby allowing Baan to artificially realize even greater revenue. (Levy Decl. 11/29/02, Ex. 3.)

This was a boon not simply to Baan. Indeed, while it was making these deals and thereby enabling Baan to allegedly

misstate its revenues, Vanenburg actually had a direct interest in Baan's deceptive accounting practices. For these practices redounded to Vanenburg's benefit in a concrete and immediate way. As noted above, Vanenburg was paying Baan for the expenses associated with operating BMS, thus eliminating certain expenses that Baan otherwise would have had to carry on its books. (Levy. Decl. 11/29/02, Ex. 11 [Dep. of Marvin Newell] at 91–92.) And because these payments were financed by loans Vanenburg secured with Baan stock, Vanenburg's continued participation depended on Baan's share price remaining high. In other words, while Baan may have been the prime mover in the fraud alleged in this case, the complex scheme would not have been possible without Vanenburg's knowledge, cooperation, and involvement. And Vanenburg could not have done so without being at least complicit in the accounting violations that made the arrangement work. Like Baan, then, through its involvement with BMS and the indirect channels, Vanenburg took actions that had a direct effect on U.S. investors, and as such, it subjected itself to suit in this Court.

Plaintiffs have now adduced further evidence supporting these allegations, which connects Vanenburg with Baan's allegedly fraudulent activity. The most important document is an internal Vanenburg memo sent on September 16, 1998, by an employee named Cees van Wijngaarden to a number of Vanenburg officials, including Paul Baan. (Pls.' Supplemental Br. in Further Support of their Objections, Ex. A ["Wijngaarden Memo"].)[20] The stated purpose of the Wijngaarden Memo was to discuss certain issues connected with Vanenburg's

decision whether to purchase additional software licenses from Baan in the next quarter. To this end, Wijngaarden begins by observing that "VV [Vanenburg] is more and more becoming the source through which BC [Baan] is able to maintain its EPS [earnings per share] growth, with inventory and BMS in a crucial role." (*Id.*) Specifically, he notes that in the second quarter Baan reported $32.6 million in revenue as "sell-through" revenue from BMS. In fact, according to the memo, genuine sell-through revenue did not exceed $22 million. *"Thus, VV/BMS is aware of 'incorrect' information provided to the public."* (*Id.* (emphasis added).) This statement appears both to confirm plaintiffs' basic allegations against Baan (the disparity between the revenue recognized and the actual sell-through volume) and to implicate Vanenburg directly in that deception.

Wijngaarden further suggests that this knowledge put Vanenburg in a difficult bind. On the one hand, if Vanenburg agreed to purchase even more inventory from Baan despite knowing that such inventory could not be resold and that Baan would nevertheless recognize these sales as revenue, "VV might be regarded as an accessory when continuing to support this." (*Id.*) On the other hand, however, if Vanenburg refused to agree to the sales, Baan would likely be unable to meet EPS expectations, which would cause the company's stock price to fall. Because Vanenburg's financing arrangements for BMS depended on using Baan stock as collateral for lines of credit, a drop in the share price would seriously jeopardize Vanenburg's ability to finance the operation. (*Id.*) The

**20.** In conducting his analysis of defendants' motions to dismiss, Magistrate Judge Facciola did not have the benefit of the Wijngaarden Memo, which only came to plaintiffs' attention after the Report was filed on July 11, 2002. The Memo was apparently discovered among 14 boxes of documents that Baan produced on July 22, 2002. (Pls.' Supp. Br. in Further Support of their Objections at 1.)

memo succinctly describes this Hobson's choice and closes by suggesting the need for further discussion among top-level Vanenburg officials as to what course of action the company should take.

The Wijngaarden Memo thus provides the necessary evidence to support plaintiffs core jurisdictional allegations: (1) that both Vanenburg and Paul Baan were aware "of the incorrect BC reporting with respect to indirect channel revenue" [21]; (2) that Vanenburg, through its corporate relationship with BMS, was entangled in these reporting violations because its financial health was linked to Baan's stock price, which was in turn linked to Vanenburg's continued willingness to accept unwarranted sales on behalf of BMS [22]; (3) that Vanenburg (and not BMS) was making the decisions about purchasing additional licenses from Baan, and thus that Vanenburg had the power to stop (or at least to frustrate) Baan's fraudulent accounting scheme by refusing to buy more inventory that Vanenburg knew could not be resold.[23]

Accordingly, defendants' argument that Vanenburg cannot be connected to the misleading revenue reporting because the sales made by Baan to BMS were, in and of themselves, perfectly legal (Vanenburg's Mem. in Opp. to Pls.' Mot. for Leave to File a Second Supp. Br. Mot. at 4), ignores the context in which these sales were made, as well as Vanenburg's understanding of its own role in this scheme. As Vanenburg knew perfectly well, these sales were not the arms-length transactions that defendants now suggest. Instead, the evidence suggests that Vanenburg agreed to the sales because it too sought to benefit from the same artificial revenue reporting that led Baan to make those sales in the first place. This loop cannot (as defendants would like) be examined link by link, but must instead be considered as a whole, for that it how it seems to have functioned. As such, Vanenburg's participation in that scheme is not neatly separable from Baan's deceptive accounting practices; rather, the record reflects that Vanenburg's actions were both necessary to and dependent upon Baan's underlying fraud.

For these reasons, the Court concludes that plaintiffs have now adequately supported their allegations of a causal link between Vanenburg and the adverse effects felt in the United States. The combination of Vanenburg's control person status and its knowledge of the activities alleged to have harmed U.S. investors, as well as the evidence indicating that Vanen-

---

21. In addition, a mid–1998 audit report prepared by Vanenburg's auditor suggested that Baan's estimates regarding end-user sales in the BMS channel were exaggerated, and therefore that Baan's revenue recognition for such sales should be reduced substantially. (Levy Decl. 11/29/02, Ex. 6.) This is further evidence that Vanenburg knew about Baan's accounting practices at the time that Vanenburg was intimately involved in the complex loop that made those practices successful.

22. As Wijngaarden bluntly noted: "If BMS was not part of VV there would not be a financing problem." (Wijngaarden Memo.)

23. The memo observes that a "decision needs to be taken on what level of inventory VV/BMS is willing to purchase for Q3 and be-

yond" and that "VV/BMS need to clearly define its policy with respect to what inventory level is regarded as acceptable and dependable." (Wijngaarden Memo.) This appears to belie defendants' argument that "Vanenburg was not a participant in the challenged transaction," and therefore cannot be made to account for an arrangement negotiated between Baan and BMS. (Def. Vanenburg Group's Mem. in Opp. to Pls.' Mot. for Leave to File a Second Supp. Br. at 4.) The evidence instead suggests that Vanenburg, not BMS, negotiated with Baan regarding the indirect channel sales, and that Vanenburg, not BMS, made the ultimate decisions about the volume of consignment sales that would be accepted.

burg was an integral and willing partici-
pant in the scheme giving rise to this
harm, reveals sufficient contacts with the
United States to render the exercise of
personal jurisdiction consistent with funda-
mental fairness and due process. In sum,
the evidence presented, construed in plain-
tiffs' favor, creates the "factually docu-
mented prima facie case" necessary to de-
feat Vanenburg's challenge to personal
jurisdiction.

Turning now to Paul Baan, plaintiffs
have similarly shown a direct causal link
between his activity and the harmful con-
sequences allegedly suffered by investors
who bought Baan stock in this country.
First, the Wijngaarden Memo implicates
Paul Baan as much as it does Vanenburg.
Not only was Paul Baan one of its original
recipients, but the memo was then for-
warded to Tom Tinsley (Baan's CEO at
the time) on September 22, 1998, upon
Paul Baan's specific request. (Wijngaar-
den Memo, cover page.) Thus, the analy-
sis applied above to Vanenburg—control
person status plus complicit participation
gives rise to jurisdiction—extends equally
to Paul Baan. Moreover, plaintiffs have
presented evidence to suggest that Paul
Baan was directly involved in the estab-
lishment of BMS, specifically that he led
Vanenburg's team on this issue. (Levy
Decl. 11/29/02, Ex. 1 [Tinsley Dep.] at 78–
79.) Indeed, Paul Baan signed the agree-
ment on Vanenburg's behalf setting up the
new company in December 1997. (Levy
Decl. 11/29/02, Ex. 5.) This direct involve-
ment in the BMS channel, along with Paul

Baan's position as both the head of Vanen-
burg and a member of Baan's board of
directors, at the very least raises the credi-
ble inference that he was aware of the
scheme to use BMS and Vanenburg to
artificially meet Baan's revenue expecta-
tions.[24] The propriety of this inference is
bolstered by the testimony of Jan Baan,
who reported that Paul Baan knew about
the inventory level discrepancies relating
to BMS. The two brothers apparently dis-
cussed the matter on a trip they took in
September 1998, which occurred at about
the time of the Wijngaarden Memo. (Levy
Decl. 11/29/02, Ex. 15 [Jan Baan Dep.] at
118–19.)

Like Vanenburg, then, Paul Baan was a
party to an arrangement designed to allow,
and indeed fueled by, the deceptive ac-
counting that is the basis for plaintiffs'
cause of action. Therefore, even if plain-
tiffs have not produced evidence that ei-
ther defendant actually *directed* Baan's al-
leged fraud, plaintiffs have nevertheless
met their burden of making a *prima facie*
case that personal jurisdiction exists as to
these defendants. Plaintiffs have sup-
ported their allegations that these defen-
dants were intimately involved (even indis-
pensable) in the creation of the indirect
channels on which Baan relied to meet its
revenue projections, and that they had
been made aware of the accounting prac-
tices that Baan used to deceive investors.
This is enough. Where a party with the
ability to control a corporation that has
jurisdictional contacts with the forum
knows about and willingly participates in a

---

**24.** Plaintiffs point to a number of reports that
Paul Baan would have received as a Baan
board member regarding the company's ac-
counting practices. (Pls.' Supp. Mem. of Law
in Opp. to Def. Paul Baan's Mot. to Dismiss at
9–13.) For example, a June 1998 Manage-
ment Letter from MEY to the Baan board
noted because "Baan USA was not using the
standard revenue recognition checklist de-

signed and required to be completed under
Baan's current policy," there was "a risk of
inappropriately recognizing revenue before
all the relevant revenue recognition criteria
are adequately met." (Levy Decl. 5/2/02, Ex.
2 at 5.) MEY also sent a similar warning to
Paul Baan in his capacity as a Vanenburg
executive. (Levy.Decl.11/29/02, Ex. 10.)

scheme devised by that corporation, and thereby harms investors in the forum, personal jurisdiction is appropriate. Nothing in defendants' voluminous pleadings persuades the Court otherwise.

## CONCLUSION

For the reasons given above, the Court finds that the exercise of personal jurisdiction against defendants Paul Baan and Vanenburg is authorized both by the Securities Exchange Act and the Due Process Clause. The Court therefore rejects the Magistrate's Report and Recommendation and denies defendants' motions to dismiss.

### *ORDER*

For the reasons set forth in the attached Memorandum Opinion, it is hereby

**ORDERED** that the Report and Recommendation filed by Magistrate Judge Facciola on June 11, 2002 is **REJECTED**; it is

**FURTHER ORDERED** that defendant Vanenburg Group's Motion to Dismiss for Lack of Personal Jurisdiction [# 141–1] is **DENIED**; and it is

**FURTHER ORDERED** that defendant J.G. Paul Baan's Motion to Dismiss for Lack of Personal Jurisdiction [# 141–2] is **DENIED**.

**SO ORDERED.**